John J. RITTER, Plaintiff,

v.

ROHM & HAAS COMPANY, Defendant.

No. 64 Civ. 3216.

United States District Court
S. D. New York.

June 28, 1967.

Kenneth B. Ray, New York City, for plaintiff; Nicholas M. Selinka, New York City, of counsel.

Burgess, Ryan & Hicks, New York City, for defendant; John F. Ryan, New York City, Connolly, Bove & Lodge, Arthur G. Connolly, Januar D. Bove, Jr., Wilmington, Del., of counsel.

## OPINION

MacMAHON, District Judge.

Plaintiff, John J. Ritter, New York University Professor Emeritus in organic chemistry, sues for infringement of his United States patent, No. 2,573,673, entitled "Method of Producing N-Mono Substituted Imidic Compounds,"[1] issued October 30, 1951 on a continuation in part application filed May 27, 1950 and

1. The factual issues here involve complex technical problems in the discipline of advanced organic chemistry. These problems can neither be expressed nor understood without reference to, and familiarity with, the underlying scientific terms, symbols, and concepts of modern organic chemistry. It is not our function to write a text on the subject, but we do append a much-abridged glossary as part of our findings. The glossary draws upon evidence in the record and standard

an earlier application filed January 27, 1945. Defendant, Rohm & Haas Company, a manufacturer of chemicals, denies infringement and counterclaims for declaratory judgment of noninfringement, invalidity, and unenforceability.

Only claims 1, 4–7, 13, and 16–18 of the Ritter patent are before the court for adjudication. In essence, all of them claim discovery of a single step in a process for producing N-mono hydrocarbon substituted imino compounds by reacting three components—any nitrile, certain cationoid compounds, and certain ethylenic substances—under substantially anhydrous conditions.[2] It is important to note that the patent teaches, but does not claim, a second step: that "the products of * * * [the first step] constitute intermediates * * * which will further react readily with water * * * forming various amidic compounds. In the case of water, the resultant products are N-mono substituted amides." [3]

Defendant manufactures four N-mono substituted amides which it converts to amines. Each of its accused processes reacts hydrogen cyanide (a nitrile), sulfuric acid (a cationoid), and an olefin (an ethylenic substance). There is no question that all of those reactants fall within the class of compounds claimed by plaintiff's patent. The parties are at odds, however, on (1) whether defendant's processes use water as a fourth component of a single step reaction, and (2) whether defendant's processes produce an imino compound.

Denying infringement, defendant claims (1) that its accused processes are not conducted under substantially anhydrous conditions because they all use water as a fourth reactive component in a single step reaction, and (2) that its processes produce, not an imino compound, but a protonated amide, which it then reacts with water to produce an N-mono substituted amide.

Asserting infringement, plaintiff claims (1) that defendant's processes are conducted under substantially anhydrous conditions because no water, as such, is present and, in any event, water is not a reactive fourth component, and (2) that defendant's processes produce an imino compound which defendant then reacts with water to produce an N-mono substituted amide.

As we said above, Ritter teaches a first step (producing the imino compound) and then a second step (reacting the imino compound with water to produce an N-mono substituted amide). Ritter originally tried to patent both steps. The Patent Examiner rejected this application as unpatentable over the prior art, particularly the Gresham patent. In order to distinguish his patent from the prior art, Ritter gave up the second step and restricted his claims to the first step, the one-step, three-component reaction "under substantially anhydrous conditions."

Defendant claims that the quoted phrase impales plaintiff on the horns of a dilemma. If the phrase is stretched to include as much water as defendant uses, Ritter's patent (1) reads on the prior art, or (2) covers a different reaction which produces a different product which Ritter never taught or claimed—the protonated amide. If it is restricted to exclude that

text materials. See Roberts-Caserio, Modern Organic Chemistry (1967); Smoot-Price-Barrett, Chemistry: A Modern Course (1965); Dull-Metcalfe-Williams, Modern Chemistry (1958, 1962).

2. Claim 1 is the broadest: "In a process for producing an N-mono hydrocarbon substituted imino compound, the step which comprises reacting one molecular equivalent of a nitrile based on the number of nitrile groups therein with one molecular proportion of a cationoid compound from the group consisting of sulfuric acid, hydrocarbon sulfonic acids and alkyl sulfuric acids and one molecular equivalent based on the number of ethylenic double bonds therein of an unsaturated hydrocarbon from the group consisting of non-conjugated alkenes having at least three carbon atoms, cyclic terpenes and mono-aryl substituted non-conjugated alkenes, under substantially anhydrous conditions."

3. PX 1, col. 1, lines 12–20.

much water, defendant's processes do not infringe.

### The Issues

Defendant has also leveled a barrage of other defenses. Defendant contends that the patent is invalid because of anticipation, obviousness, fatally indefinite claims, and misrepresentations to the Patent Office. Defendant asserts that the patent is unenforceable against it because of laches. Moreover, in arguing non-infringement, defendant invokes the doctrine of file wrapper estoppel. We now consider these issues seriatim.

### A. Validity

#### (1) The I. G. Farben French Patent

The first prior art reference cited by defendant is I. G. Farben's French patent, No. 902,342 (PX 2), which bears a "delivre" date of December 4, 1944. Ritter concedes that this patent discloses his invention, but asserts that it does not invalidate his patent because (1) Farben's process was not "patented" within the meaning of 35 U.S.C. § 102(a) until after January 27, 1945, the date Ritter filed his application, and (2) even if Farben's process was "patented" on December 4, 1944, Ritter actually invented his process before that date.

#### (a) Date of the Farben Patent

The court tried the issue regarding the date of the Farben patent before all others and found from the bench that I. G. Farben's process was "patented" within the meaning of 35 U.S.C. § 102(a) on December 4, 1944 (Tr. 151–54).

There is no dispute that, in France, all the rights of a patentee accrue to him on the "delivre" date of his patent (Tr. 36–40, 72–73). On that date, the Minister of Industry grants the application by signing a decree. Soon afterward the Patent Office notifies the applicant. As of the "delivre" date, the patentee acquires a monopoly right to exclude others,

and he can sue for infringement. However, unlike American patents, French patents are not published on the same day they are granted. Here, the fact that the Farben application had been granted was not published in the Bulletin Officiel de la Propriete Industrielle (the "BOPI") until July 6, 1945, and the text of the patent was not published in printed form until August 28, 1945.

Plaintiff relies on In re Ekenstam, 256 F.2d 321 (C.C.P.A.1958), which held that a foreign invention is not "patented" within the meaning of 35 U.S.C. § 102(a) until the patent is available to the public. *Ekenstam* explicitly contradicted General Electric Co. v. Hygrade Sylvania Corp., 61 F.Supp. 476, 529 (S.D.N.Y. 1944). Both cases involved Belgian patents. *General Electric* stated in a terse dictum that a Belgian invention is "patented" as soon as the ministerial decree issues, rather than when the patent is published. *General Electric* relied on Sirocco Engineering Co. v. B. F. Sturtevant Co., 220 F. 137 (2 Cir. 1914), cert. denied, 238 U.S. 636, 35 S.Ct. 939, 59 L.Ed. 1500 (1915), which involved two French patents dated 1890 and 1896. However, there are several crucial differences between the Belgian system and the old French system involved in *Sirocco* (Tr. 80–82; In re Ekenstam, supra, 256 F.2d at 324). Therefore, *General Electric* is not entitled to much weight.

We shall assume, *arguendo*, that *Ekenstam* is correct and that the word "patented" in 35 U.S.C. § 102(a) connotes "available to the public." The Second Circuit has never said otherwise, for in *Sirocco* it was undisputed that the 1890 and 1896 patents there involved were available to the public.[4]

Thus, the question before us is whether Farben's French patent was available to the public on December 4, 1944. Plaintiff contends that it was not available until July 6, 1945, when the BOPI published a short paragraph list-

---

4. "It is also asserted, and not denied, that these patents were never published or printed, although certified copies of such patents may be procured from the French patent office." Sirocco Engineering Co. v. B. F. Sturtevant Co., 220 F. 137, 142 (2 Cir. 1914), cert. denied, 238 U.S. 636, 35 S.Ct. 939 (1915).

ing I. G. Farben's name, the date of its application, and the title of its patent (PX 5, p. 355). The BOPI is simply a periodical list of patent applications which have been granted.

It is undisputed that the French practice from 1903 to 1964 was to type the patentee's name, the date of its application, and the title of its patent on a file card which was available to the public in the French Patent Office even before the patent was granted (Tr. 49, 73–75). However, plaintiff's expert, Dr. Soubbotitch, testified that during World War II the file cards were not kept and the Patent Office was closed (Tr. 49). This was flatly contradicted by defendant's expert, Mr. Miller, who testified that "the Vichy Government functioned very, very well," that the file cards were at all times kept quite regularly (Tr. 105–08), and that the I. G. Farben patent could not have been given its number unless a file card had been kept for it (Tr. 117). Neither witness was in France during World War II. Having observed both witnesses and their manner of testifying, the court was more impressed with the demeanor of Mr. Miller and with his answers, which were frank and responsive. The court found him the more credible witness. Accordingly, we find that in 1944 and 1945 the file cards were kept regularly for each and every patent in the French Patent Office and were available to the public even before the patents were granted.

There were "watchers" in the French Patent Office who would search the card file for inventions which might interest their employers (Tr. 97, 106–07). The title on every card precisely expressed the subject matter (Tr. 97–99). Once the "watcher," or anybody else, found a card that interested him, he could, between 1903 and 1955, obtain a copy of the patent as soon as it was granted, i. e., on the "delivre" date.[5]

Miller testified that all that was necessary to obtain a copy of the patent was the payment of a five franc fee fixed by the decree of 1903 (Tr. 74, 82–83 and 101–02 referring to PX 9 for Id., p. 2, item 6). Soubbotitch conceded that five francs was all that was necessary after the BOPI date (Tr. 64). Nevertheless, he claimed that, between the "delivre" date and the BOPI date, no member of the public could obtain access to the patent unless he obtained permission from the Minister of Industry (Tr. 44, 53, 56–57).

In support of his testimony, Soubbotitch relied on: (1) an order of 1955 (not in evidence) which provided that patents be kept secret until the BOPI date (Tr. 50–53, 74–75), and (2) a decree of 1966 (not in evidence) which provides that, between the "delivre" date and the BOPI date, no member of the public can obtain access to the patent unless he receives permission from the Minister of Industry (Tr. 62–64). Soubbotitch claimed that both provisions are declaratory of the previous law (Tr. 51–53, 56–57, 64–65). Miller disagreed (Tr. 74–75).

We find that neither provision is declaratory of the previous law. There is a gap of eleven years between these two provisions, and during that time, in 1964, the French discontinued the card file system (Tr. 85). It is clear that the French law underwent successive adjustments. We are convinced that Soubbotitch was trying to divine the 1944 law from the state of the law in 1966. He is contradicted by the Langer Bulletin, "Foreign Digest Foreign Patents," 4th ed., p. 107, which was published in 1951 (Tr. 47–48).

Defendant's position is also confirmed by the Patent Office Board of Appeals, which is bound by the *Ekenstam* decision. Ex parte Gruschwitz and Fritz, 138 U.S.P.Q. 505, 510 (1961), discusses *Ekenstam* and explicitly reaffirms the

---

5. When a patent was granted, that fact was not immediately noted on the card in every instance (Tr. 116, 119). This is not important, because any patent is granted in France as long as it is in proper form; novelty and prior art are not considered (Tr. 20–21, 47).

Board's longstanding [6] practice of considering a French invention "patented" on its "delivre" date.

In any event, the dispute between Miller and Soubbotitch is not really substantial, for Soubbotitch admitted that he did not know what criteria, if any, governed the exercise of the discretion of the Minister whose permission he claimed was required (Tr. 45). Even if we were to assume that permission was required, for all we know it was a mere ritual and in no way prevented the public from seeing the patents.

We found Miller the better qualified of the two experts. He is a practitioner of patent law in France. Soubbotitch is associated with a law firm in New York, and, although an expert in French law generally, he has no particular background in patent law (Tr. 31–33). His knowledge of French patent practice is based almost solely on what he has read and heard.

There is some indication in the evidence that no third person saw this particular French patent, but that is immaterial (PX 6, last paragraph). The controlling question under the *Ekenstam* case is not whether anyone in fact saw the patent but whether the patent was available to the public.

■ Accordingly, we find that French Patent No. 902,342 was available to the public and was "patented" within the meaning of 35 U.S.C. § 102(a) on December 4, 1944. This finding raises the question of whether Ritter is entitled to a pre-filing invention date before December 4, 1944.

### (b) *Pre-Filing Invention Date*

■ Ritter is entitled to a pre-filing invention date if he conceived and reduced his invention to practice before the key date, December 4, 1944.[7] The burden of proof required to establish a pre-filing date of invention rests on the plaintiff, and it is a heavy one; the court "must be persuaded with a certainty which is seldom demanded elsewhere; quite as absolute as in a criminal case * * *."[8] Moreover, a pre-filing invention date may not be established by the inventor's "uncorroborated testimony" alone.[9]

### (i) *Conception*

■ "The conception of the invention consists in the complete performance of the mental part of the inventive act. All that remains to be accomplished in order to perfect the act or instrument belongs to the department of construction, not invention. It is therefore the formation in the mind of the inventor of a definite and permanent idea of the complete and operative invention as it is thereafter to be applied in practice that constitutes an available conception within the meaning of the patent law. A priority of conception is established when the invention is made sufficiently plain to enable those skilled in the art to understand it."[10]

Plaintiff contends that he conceived his invention on November 6, 1944, when, after a series of earlier experiments and observations of the reaction of his three components, he expressed his idea of what had occurred in specific formulas and equations recorded in his notebook. Defendant contends that

6. Ex parte Hendrickson, 45 U.S.P.Q. 108 (1940).

7. Farrand Optical Co. v. United States, 325 F.2d 328 (2 Cir. 1963). Cf. 35 U.S.C. § 102(g).

8. United Shoe Machinery Corp. v. Brooklyn Wood Heel Corp., 77 F.2d 263, 264 (2 Cir. 1935). See Helene Curtis Industries, Inc. v. Sales Affiliates, Inc., 233 F.2d 148, 156 (2 Cir.), cert. denied, 352 U.S. 879, 77 S.Ct. 101, 1 L.Ed.2d 80 (1956); Oelbaum v. Lovable Co., 211 F.Supp. 594, 600 (S.D.N.Y.1962), aff'd per curiam, 322 F.2d 1022 (2 Cir. 1963).

9. Rooted Hair, Inc. v. Ideal Toy Corp., 329 F.2d 761, 767 (2 Cir.), cert. denied, 379 U.S. 831, 85 S.Ct. 63, 13 L.Ed.2d 40 (1964).

10. Townsend v. Smith, 36 F.2d 292, 295 (C.C.P.A.1929); Summers v. Vogel, 332 F.2d 810, 814 (C.C.P.A.1964).

there is no corroboration for Ritter's claimed conception and that, at best, the formulas and equations set forth in his notebook are mere speculations.

As proof of conception, Ritter testified that commencing on October 19, 1944 he conducted a series of experiments reacting the three components of his patent and formed an N-mono alkyl imino compound (Tr. 159–163, 238, 257). He offered his notebook in corroboration. The authenticity of the notebook is conceded (Pre-Trial Order, p. 2, par. 4). Its genuineness is attested by its appearance, its chronological order spanning a period of twelve years, from 1933 to May 15, 1945, and its notation of a great variety of experiments covering 300 pages, most of which are unrelated to the claimed invention. Defendant failed to impeach the notebook in any way, and there is not the slightest suggestion in the evidence of fabrication.

Defendant asserts that Ritter's notebook is of no evidentiary value, regardless of how persuasive it may be, because it is a "self serving" document and not the "independent corroboration" the law demands. We note at the outset that this is different from defendant's legal contention at the pre-trial conference (January 27, 1967 Tr. 13–14). There is no question that Ritter's oral testimony, standing alone, is insufficient to prove conception.[11] The notebook is the only corroborative evidence introduced by plaintiff; if it is legally insufficient to establish corroboration, Ritter cannot prove an invention date prior to the French patent, and his patent is invalid.

We have found no case in this circuit expressly dealing with the nature of the corroborative evidence required. Decisions elsewhere are split. Some rigorously demand "independent" evidence; any documents prepared by, or under the supervision of, the inventor are "self serving" and cannot provide corroboration.[12] Others stress that it is the oral *testimony* of the inventor which must be corroborated, and this can be done by any means, including the use of diaries, notebooks, and records prepared by the inventor, as long as this evidence is "clear and convincing."[13]

We are disinclined to rely on quantitative rules of evidence in our search for truth. Their appeal of simplicity is outweighed by the vice of blindness. Rather, we look to the purpose behind the rule requiring corroboration for guidance in its application. The manifest purpose of the rule is to prevent fraud. When the validity of a patent turns on the exact date a certain event occurred, or discovery was made, there is an inherent risk of perjury if after-the-fact oral testimony by the most interested party, the alleged inventor, can carry the invention date back beyond the filing date.[14]

In light of that purpose, it would be absurd to hold that Ritter's notebook is not sufficient corroboration, but that "independent" evidence of his conception date is required. The issue here is the exact date when, in late 1944, almost twenty-three years ago, Ritter conceived his invention. His notebook, a document of uncontested authenticity, is a contemporaneous record of his thoughts and actions. It is hard to imagine what more reliable corroborative evidence could be found. Indeed, we note that it was similar documentary evidence that Judge Learned Hand held sufficient to establish a pre-filing invention date in United Shoe Machinery Corp. v. Brook-

11. See, e. g., Rooted Hair, Inc. v. Ideal Toy Corp., supra, 329 F.2d at 769.

12. See, e. g., Jepson v. Egly, 231 F.2d 947, 43 CCPA 853 (1956) ; Searle v. Glarum, 179 F.2d 974, 37 CCPA 896 (1950) ; American Machine & Foundry Co. v. Liggett & Myers Tobacco Co., 172 F.Supp. 12 (D.N.J.), aff'd, 272 F.2d 451 (3 Cir. 1959).

13. See, e. g., Allen v. Blaisdell, 196 F.2d 527, 39 CCPA 951 (1952) ; Thompson v. American Tobacco Co., 174 F.2d 773 (4 Cir. 1949) ; Jackson v. Dunham-Bush, Inc., 220 F.Supp. 377 (D.Md.1963), aff'd, 333 F.2d 287 (4 Cir. 1964). Compare Monaplastics, Inc. v. Caldor, Inc., 378 F.2d 20, 2 Cir., May 29, 1967.

14. See Allen v. Blaisdell, supra.

lyn Wood Heel Corp., 72 F.2d 263 (2 Cir. 1935). To assert that the "independent" recollection of some of Ritter's former students about what transpired during the few crucial weeks in 1944 would be more probative than the immutable notebook flies in the face of common experience. Memories are fallible, particularly in trying to recall the precise date of long forgotten events whose importance is only subsequently created by the Byzantine nuances of litigation. To rule out Ritter's notebook on the ground that it is "self serving" is to exalt labels over reason. There is not the slightest hint that the notebook is a fabrication or that any of the entries are not genuine expressions of Ritter's thoughts and deeds on the date entered. Of course, if the notebook is probative, it is "self serving" in the sense that it aids Ritter's cause, but all evidence suffers from such corrupting limitations. .

We hold, therefore, that Ritter's notebook is admissible as corroborative evidence and turn to a detailed examination of its contents.

On November 6, 1944, at page 245 of his notebook, Ritter wrote:

"Assembling these facts, and harmonizing them with general considerations from the nature of the reaction system, I now believe the following to have occurred:

---

15. The equation is not perfectly balanced, for there should be an ($OSO_3H$) minus on the left side of the first equation and a minus sign on the bracket ($OSO_3H$) on the right (Tr. 272). Defendant's witness Mark conceded that the missing

Ritter testified that the formula at the right of the third equation,

$$R\text{---}\underset{\underset{CH_3}{|}}{\overset{\overset{CH_3}{|}}{C}}\text{---}N\text{---}\underset{\underset{CH_3}{|}}{\overset{\overset{OSO_3H}{|}}{C}}\text{,}$$

is the formula for an N-mono hydrocarbon substituted imino compound, and that it is the same formula appearing in more generalized form in his patent.[16] Defendant's expert, Dr. Mark, agreed (Tr. 301–02), and we so find.

Plaintiff contends that the foregoing evidence proves conception of his invention before the key date. Defendant argues, however, that Ritter's testimony and his notebook show only speculation. It asserts that the notebook shows that Ritter did not have the vaguest notion of his invention until years later, when he filed his amended application for his patent.

Before the key date, Ritter never named any of the structures on page 245 except the final amide (see Tr. 667). One should not assume that at that time he gave no more significance to the imino at the end of the third equation than he gave to the structures at the end of the first and second equations. As we shall see, the imino compound was a tangible "intermediate;" the structures at the end of the first and second equations were intangible "transients." (See Tr. 636–37.)

At page 245, Ritter used the word "believe." Ritter testified on his pretrial deposition that "in other places in the notes" he wrote down what he thought might happen, sometimes what did happen, and sometimes his interpretations (Tr. 650). As late as January 6, 1945, he wrote "speculations on reaction mechanism or dynamics" (PX 12, p. 276).

Defendant stresses the testimony of its experts that Ritter's equations were speculations and that other possible, and more likely, intermediates may also be speculated (Tr. 275–280, 321–332, 509, 971–73; PX 16; DX AA, AB and AC). Defendant further points to the fact that the only product Ritter analytically identified was the amide and that he never isolated, purified, or identified his postulated imino by accepted chemical analyses and tests (Tr. 237–39, 251, 643–44). Finally, defendant cites the testimony of its own expert that, without such tests, no one could determine the actual structure of the intermediate (Tr. 282).

When expert chemists, like plaintiff and defendant's experts, use the words "speculation" or "belief," they do not mean that their formulas and equations are wild, irrational, unintelligible guesses. Rather, it is perfectly plain that when skilled chemists, like Ritter, first experiment with a chemical reaction and then write specific structural formulas of starting compounds, reaction mechanisms and resulting products, they are applying well-known laws, concepts and symbols of chemistry along with background knowledge to give rational physical explanations of observed facts (Tr. 180; 565–69; 669; 671; 673).

Plaintiff's expert Meyers had no difficulty either in understanding or explaining Ritter's formulas and equations (Tr. 565–69) or in recognizing the intermediate as an N-mono hydrocarbon substituted imino compound (605–08). Defendant's expert Mark conceded that he understood Ritter's formulas and equations, that they were expressed in accordance with the laws of organic chemistry, and that Ritter's postulated imino compound was one possible intermediate at the stage of the reaction where it is shown in his equations (Tr. 271–73; 282). Thus, there can be no question that Ritter's formulas and equations made his invention suffi-

signs are readily apparent and would be implied by any skilled chemist (Tr. 301–02, 318–19).

16. PX 1, at the right of formula I, col. 3, line 5 (Tr. 183).

ciently plain to enable those skilled in the art to understand it (Tr. 605–08).

It is, therefore, of no moment that the words "imide," "imidic," and "imino" do not appear anywhere in Ritter's notebook, nor that he never used any such terms until they first appeared in his amended application of 1951 (Tr. 676). As Ritter testified, although he did not name any imino compound, he knew that the reaction shown in the notebook involved an imino compound, and he clearly expressed the imino by structural formula (Tr. 676–77). We agree. Words are unnecessary to express an idea. Symbols, formulas, and equations are the non-verbal language of organic chemists and convey meaning better than words to those skilled in the art.[17] In the modern world of science, symbolic communication rules vast domains of knowledge, experience, and meaning, and we must recognize that reality. That Ritter's formula for his intermediate would convey his idea to skilled chemists is conclusively demonstrated by the fact that defendant's employee, Dr. Bortnick, working independently with the reactions of the same three components and long before any prospect of this litigation, postulated an imino compound using the same formula as Ritter (PX 28, p. 3).

The focus of the inquiry on the issue of conception is the idea formed in the mind of the inventor and not on whether his idea is right or wrong. It is, therefore, immaterial on the issue of conception that others skilled in the art might, with equal logic, conceive other possible mechanisms and intermediates. True, the postulated imino compound was not isolated or identified by chemical tests of the type urged by defendant, but, as we shall see, such tests are unnecessary in the circumstances. The question to be answered is: Did Ritter have a definite and permanent idea of the invention expressed in his claims?[18] Manifestly, Ritter's formulas and equations of November 6 show not some vague ruminations of what might, or might not, have happened, but a decisive, unequivocal, definite, permanent, and clear expression of a completed and concrete idea. He had made up his mind without doubt or ambiguity and expressed his thoughts in specific formulas and equations. The mental part of his invention was over and done with, then and there, and he was committed to the starting materials, the mechanism of the reaction, and the intermediate product involved here.

There is not the slightest evidence that Ritter ever wavered or changed his mind before the filing date. The January 6 notation "speculations on reaction mechanism" in no way indicates that Ritter's conviction was wavering or that he had any second thoughts about the concrete idea expressed earlier on November 6, at page 245 of his notebook, where he shows his invention in its entirety, as expressed in the claims of his patent. The later "speculations" of January 6, at page 276, are merely an even more elaborate explanation of the same completed basic concept expressed earlier. As Ritter testified, he was merely studying the reaction on January 6, still learning about it, and he has been learning about it ever since (Tr. 649). Surely continued study of the theoretical underpinnings of his process did not negative the finality of his original conception.[19]

We hold, therefore, that Ritter did conceive his invention before the key date. We turn to the question of whether he reduced his invention to practice.

(ii) *Reduction to Practice*

What constitutes a reduction to practice depends on the particular

17. 35 U.S.C. § 112; Petesi v. Rennhard, 363 F.2d 903, 906 (C.C.P.A.1966); Summers v. Vogel, supra.

18. Townsend v. Smith, supra, 36 F.2d at 295.

19. Cf. Breen v. Miller, 347 F.2d 623, 628 (C.C.P.A.1965).

facts of each case.[20] Ritter's invention was not upon a product but upon a step in a process. The issue is, therefore, governed by the rule that "[a] process is reduced to practice when it is successfully performed."[21] Reduction to practice, thus, requires proof that the process was actually carried out,[22] that it worked to produce its intended product,[23] and that the product was useful.[24] "Products are useful if they serve as starting materials or intermediates in producing other materials or articles which are directly useful."[25]

The intended result of the performance of Ritter's process was to produce an N-mono hydrocarbon substituted imino compound useful as an intermediate to make an amide. Contrary to plaintiff's contention, the mere performance of the process recited in the claims is not enough. To establish a reduction to practice, it must also be shown that the specified imino compound was actually produced.[26] Ritter's right to a reduction to practice, therefore, depends upon proof (1) that he did perform his process on or before the key date, December 4, 1944; (2) that performance resulted in the production of an N-mono hydrocarbon substituted imino compound; and (3) that the imino was useful as an intermediate to produce a useful amide.

Plaintiff claims that prior to December 4, 1944 he conducted a series of experiments reacting the three components of his patented process and produced an N-mono hydrocarbon substituted imino compound which he either hydrolyzed to an amide immediately or stored and hydrolyzed to an amide later. Defendant contends that Ritter's experiments, prior to the key date, did not establish that the reaction of the three components of his patent actually produced an imino compound; that Ritter was only speculating its existence because he never isolated, purified, analyzed or identified any intermediate as an imino compound by standard chemical tests; that his tests failed to exclude the possibility of other theoretical intermediates; that his laboratory runs did not employ the equal molecular proportions required by the patent claims; that he did not establish any utility in either the intermediate iminos or in the ultimate amides; and that the tests conducted prior to the key date were limited to a relatively few compounds and did not encompass the broad generic classes claimed in the patent.

We first consider whether Ritter did perform his process, how it operated, and what it produced.

Ritter testified, and his notebook shows,[27] that before the key date (i. e., before page 259 in his notebook), he did run a series of tests reacting the three components of his patented process —five different nitriles, six different olefins, and sulfuric acid (Tr. 158–163, 171, 197–98, 205–08; PX 12, pp. 237–259). Those tests proved that five important assertions, which later appeared in his

20. Farrand Optical Co. v. United States, supra, 325 F.2d at 333.

21. Corona Cord Tire Co. v. Dovan Chem. Co., 276 U.S. 358, 383, 48 S.Ct. 380, 387, 72 L.Ed. 610 (1928).

22. Reiners v. Mehltretter, 236 F.2d 418, 421–422, 43 CCPA 1019 (1956).

23. Application of Ruskin, 354 F.2d 395 (C.C.P.A.1966); Radio Corp. of America v. International Standard Electric Corp., 232 F.2d 726, 730 (3 Cir. 1956). Cf. Farrand Optical Co. v. United States, supra; Benger Laboratories, Ltd. v. R. K. Laros Co., 209 F.Supp. 639 (E.D.Pa. 1962), aff'd, 317 F.2d 455 (3 Cir.), cert.

denied, 375 U.S. 833, 84 S.Ct. 69, 11 L. Ed.2d 64 (1963).

24. Brenner v. Manson, 383 U.S. 519, 86 S.Ct. 1033, 16 L.Ed.2d 69 (1965); Reiners v. Mehltretter, supra; 35 U.S.C. § 101.

25. Reiners v. Mehltretter, supra, 236 F.2d at 421–422.

26. Reiners v. Mehltretter, supra, 236 F. 2d at 419; Hall v. Shimadzu, 59 F.2d 225 (C.C.P.A.1933).

27. We find Ritter's notebook admissible evidence to show corroboration of reduction to practice for the same reasons it is admissible to show conception.

patent, were not just theoretical conceptions but operative facts. Thus, the tests demonstrated that: (1) the three components reacted readily at room pressure and temperature (Tr. 159; PX 12, pp. 247, 251, 253–54) and with 92% sulfuric acid (PX 12, pp. 252–53), as well as with 98% sulfuric acid (Tr. 159–163, 186–87, 222–24; PX 12, pp. 251, 253); (2) the reaction resulted in a tangible intermediate product in the form of a viscous liquid (PX 12, pp. 251, 254) from which a crystalline deposit eventually formed (Tr. 187, 241; PX 12, pp. 256, 270); (3) the intermediate product was stable because after it was formed the reaction could be interrupted or stopped and the intermediate could be left standing overnight or over a weekend (Tr. 176, 188–190, 242–44, 648–49; PX 12, pp. 238–240, 254, 256); (4) the intermediate, in either its liquid or crystal form, would readily hydrolyze to the same end product, whether hydrolyzed at once (PX 12, pp. 237, 251–52) or left standing and hydrolyzed later (Tr. 244, 649; PX 12, pp. 238–240, 254, 256); and (5) the end product resulting from the hydrolysis of the intermediate was identified as an N-mono substituted amide (Tr. 187, 236–37, 272; PX 12, pp. 243–46).

Defendant offers no evidence to refute either the tests or their observed results. We find, therefore, that before the key date Ritter did practice his invention by laboratory runs of his process and demonstrated that the three components of his patent did react under the condition specified in his patent and did produce an intermediate product which could be hydrolyzed immediately, or separated, stored and hydrolyzed later, to form an amide. The question is thus reduced to whether the intermediate product was an N-mono hydrocarbon substituted imino compound or some other substance.

It is clear that Ritter did identify the "ultimate" product as an N-mono substituted amide by analysis and determination of its molecular weight (Tr. 236–37, 243–46). Identification of the ultimate amide, however, does not establish that the intermediate product was an imino compound, for Ritter admitted that many products hydrolyze to an amide (Tr. 672–73). Nonetheless, Ritter's identification of the ultimate amide did limit the class of possible intermediates to those which hydrolyze to an amide and clearly warranted the deduction that an imino was a likely intermediate since, as even Bortnick admitted, "a hydrolysis step is required to go from a structure of the imino type to the amide structure" (Tr. 954).

Dr. Mark testified that in 1944 Ritter could have isolated the intermediate compound, washed it and performed a series of standard chemical tests which would have revealed its properties (molecular weight, boiling point, etc.) and have enabled him to determine the chemical structure of the intermediate conclusively (Tr. 321–28, 334). Without such test, according to Mark, it was impossible to exclude other compounds as the intermediate of the reaction (Tr. 271–282, 288–292, 302, 321–23, 334). Dr. Meyers testified that such tests were, and still are, impossible to perform because the imino intermediate cannot be isolated in a purified form (Tr. 756–763, 820–21, 874). Scientific studies agree (Tr. 306–08). We find support for Meyers' view in the facts that Mark, who was retained by defendant seven months before the trial, never conducted such tests on this crucial issue, although he said they could be done in two weeks (Tr. 328, 333). Moreover, there is no suggestion that Bortnick, or anyone else, ever isolated or identified Ritter's intermediate by such tests. We conclude, therefore, that Meyers is right.

In any event, there is no dispute that Ritter did not isolate and identify the intermediate compound by such tests. Indeed, he admitted that he was not interested in performing any tests for that purpose because he was only interested in getting the ultimate product, the amide (Tr. 189, 671). We turn, then, to whether he did correctly identify his intermediate as an imino compound by other means.

Mark testified that Ritter's imino compound was only one of many possible compounds which might be produced by the reaction, but he gave the formulas for only four others, which he said were equally speculative possibilities (Tr. 275, 278–282; PX 16). Ritter and Meyers testified, in substance, that no other intermediates were probable or rational, that the starting materials and products similar to the resulting products were well-known compounds, that the steps carried out were of a type generally known, that the reaction could therefore be predicted with reasonable accuracy, and that modern analytical equipment, not available in 1944, has proven Ritter right (Ritter, Tr. 668–673; Meyers, Tr. 587).

In order to determine whether the intermediate was an imino compound or some other substance, we must appraise the rational likelihood of the other possibilities postulated by Mark. We begin by noting Mark's failure to give us a mechanism or other explanation of why any of his four other postulates are rational or likely. In the absence of such an explanation, they are all highly suspect at best. We add to this the fact that Ritter did give a mechanism showing the formation of his imino, and Mark's concession that the imino postulated by Ritter conforms to the laws of organic chemistry and is therefore rational and possible. We turn, then, to the question of whether Mark's other four postulates are equally rational and possible. We deal first with formulas III, IV and V.[28]

According to a principle of organic chemistry, molecules tend to combine in the easiest and most direct way and to produce the simplest product. It was for this reason that Dr. Mark conceded that III, IV and V were less likely than II, which he preferred, because it is a direct addition product (Tr. 329). It is plain that IV and V are not direct addi-

tion products but very complex cyclic compounds having huge molecular weights. They have never been reported in the literature. Dr. Mark could not even give them a name (Tr. 279–281). It seems to us, therefore, that if IV and V exist at all, which we doubt, they represent a far more indirect and complicated reaction mechanism and intermediate product than would seem probable, especially in the absence of any rational explanation by Mark. We, therefore, reject them.

Dr. Mark testified that all of his postulated intermediates would hydrolyze to an amide (Tr. 276–77). Meyers testified on cross-examination that III would hydrolyze to an amide but only under certain conditions, but that "it would not give an amide sitting in water under the conditions that the Ritter intermediate is put into water" (Tr. 769).

The issue here is not whether formula III will ever hydrolyze to an amide, but whether it will hydrolyze to an amide under the conditions of Ritter's experiments. Meyers' specific answer, therefore, is more pertinent and persuasive than Mark's general assertion upon which defendant has chosen to rest, for despite an opportunity to contest Meyers' specific testimony by its later witness, Dr. Bortnick, defendant failed to contradict Meyers on this point. Instead, it compounded Mark's generalization by Bortnick's testimony that III would convert to a salt in water, not that it was unstable in water under Ritter's conditions (Tr. 930–31). When we add this to the fact that Mark preferred II to III, we conclude that on balance III was, and is, a highly irrational and improbable intermediate.

Further evidence that Mark's formulas III, IV and V are not rational possibilities is found in the prior teaching of Whitmore and Hanztsch. Meyers testified, without contradiction, that Professor Whitmore taught in 1932 that olefins

---

28. Plaintiff's Exhibit 16 is appended. Formula I is the postulated Ritter intermediate, and Formulas II, III, IV, and V are Dr. Mark's examples of other possible compounds.

combine with sulfuric acid to create a carbonium ion:

$$\left(R-\overset{\overset{\displaystyle C}{|}}{\underset{\underset{\displaystyle C}{|}}{C}}{}^{+}\right),$$

and Hanztsch taught in 1931 that the reaction of a nitrile with sulfuric acid produces a nitrilium salt in an ionized form:[29]

$$[R-C\!\equiv\!NH]^{+}$$
$$[HSO_4]^{-}$$

Meyers drew the mechanism of Hanztsch's reaction (PX 19) and testified that Ritter conceived that the carbonium ion could be substituted for Hanztsch's hydrogen ion. Meyers explained that the carbonium ion performs exactly the same function as Hanztsch's hydrogen ion, that is, it remains intact and is singly bonded to the nitrogen atom. That this is so is demonstrated not only by Ritter's equations but also by all four compounds postulated by Mark in plaintiff's Exhibit 16, for in each of them the carbonium ion remains intact and is singly bonded to the nitrogen atom. Since the carbonium ion remains intact, it seems most likely that Ritter's reaction proceeds along the same mechanism as Hanztsch's reaction and produces the same generic product, a nitrilium salt (Tr. 568).

We are convinced from this array of evidence that Ritter's experiments in 1944 did not produce III, IV and V, but instead produced either I or II.

Mark testified that II was well known in the literature (Tr. 326). Meyers testified that I and II were the same thing. The basis for his opinion was that, although I and II appear to have a different structure, actually II, the nitrilium salt, is a resonance hybrid of I, the imino. Referring to the formulas shown in the margin,[30] he said that "to an organic chemist, these are identical structures * * *. Any chemist * * could have drawn any one of these three structures * * * and any organic chemist would have known what that meant if these structures were put in the patent" (Tr. 572). This statement was not even averted to in extensive cross-examination; nor was Meyers directly challenged on this point by other witnesses. Bortnick, in his direct testimony, did not refute Meyers' testimony that I and II are resonance hybrids. Rather, first he evaded, stating that II was a nitrilium salt and I an imino compound (Tr. 948). Meyers, of course, would agree, but the issue was whether they were resonance hybrids. Later, in response to the court's questions, he tended to agree with Meyers (Tr. 997–99).

---

29. This is Bortnick's formula for a nitrilium salt (DX AA). Meyers (PX 19) gave it accurately, but less clearly, as a resonance hybrid double formula:

$$R-C\!\equiv\!\overset{+}{N}H \longleftrightarrow R-\overset{+}{C}\!=\!\underset{\cdot\cdot}{N}H$$
$$HSO_4^{-}$$

Bortnick testified that, instead of writing a double formula, as Meyers did, the same phenomenon could also be expressed more clearly in one formula with three dots on top of the double bond.

30.

$$\left[\,R-C\!\equiv\!\overset{+}{N}H\longleftrightarrow R\quad\overset{+}{C}\quad\underset{\cdot\cdot}{N}H\,\right]\rightleftharpoons R-\overset{|}{\underset{|}{C}}\!=\!NH$$
$$HSO_4^{-} \qquad\qquad OSO_3H$$

Mark drew II as $-N \equiv C$ and identified it as a nitrilium salt. Mark testified that Ritter, at page 245 of his notebook, drew his imino in its ionized form, $-N \overset{+}{=} C$ (Tr. 316–17). Asked on cross-examination whether II was a resonance hybrid of the ionized form of I, Mark replied, "I don't think so" (Tr. 319). He gave no explanation whatever for his opinion. However, he did agree with Meyers that resonance hybrids were "twins" (Tr. 318). Meyers, in Exhibit 19, gave a somewhat different formula for a nitrilium salt as:

$$R - C \equiv \overset{\oplus}{NH} \longleftrightarrow R - \overset{\oplus}{C} = \underset{\bullet\bullet}{NH}$$
$$\overset{\ominus}{HSO_4}$$

Bortnick corroborated Meyers' formula for the nitrilium salt. "[T]hese compounds have been shown as N triple bond C with a plus charge on nitrogen, they have been shown as N double [bond] C with a plus charge on carbon * * *. [I]t has been represented both ways and it is understood by chemists to mean that it is neither of those but some intermediate structure" (Tr. 998–99). Bortnick drew a nitrilium salt as

$$[(CH_3)_3 \ C - N \overset{+}{\equiv} CH] + HSO_4^-$$

(DX AA). Bortnick testified that the three dots on top of the double bond ($-N \overset{\cdot\cdot\cdot}{=} CH$) "are meant to show the same kind of phenomenon," namely a resonance hybrid (Tr. 999).

We find that Dr. Mark's formula for the nitrilium salt is technically inaccurate, that nitrilium salts are resonance hybrids, and that the only formulas which correctly reflect this phenomenon are those of Dr. Meyers and Dr. Bortnick. We further find that an organic chemist would understand that a nitril-

ium salt is chemically identical with Ritter's imino sulfate.

Ritter testified that his experiments showing that his intermediate hydrolyzed to an amide, taken together with the well-known nature of the antecedent reagents and the sound, published "body of fact and theory bearing on the situation," notably "the monumental work of Arthur Hanztsch bearing on the behavior of nitriles in strong acids," led him to the "only reasonable conclusion that one could draw with respect to the structure of the compound," viz., "the unequivocal conclusion" that it was an N-mono hydrocarbon substituted imino sulfate (Deposition, Tr. 668–673). Meyers agreed (Tr. 559–569). Neither Mark nor Bortnick were asked about the background teaching of Whitmore or Hanztsch. Nevertheless, the soundness of Ritter's conclusion is reinforced by the fact that Bortnick, himself, fully aware of the phenomenon of resonance hybrids and before any prospect of this litigation arose and with no motive to obfuscate, formulated the product of the reaction precisely as did Ritter (PX 28). So, too, did other scientists working independently (Tr. 306).

That Ritter's postulation of the product was sound is further buttressed by Bortnick who recognized that an "hydrolysis step is required to go from the structure of the imino type to the amide structure" (Tr. 954) and that an imino compound "is generally supposed to be an intermediate in all hydrolysis reactions of nitriles and salts of this type" (Tr. 958). It stands uncontradicted that the N-mono hydrocarbon substituted imino compound is referred to in the scientific literature as the Ritter intermediate (Tr. 193). Other hydrolysis reactions of nitriles were known in 1944.[31]

The evidence is clear that the starting materials and products similar to Ritter's ultimate products were well-known compounds, the steps carried out were of a type which were generally known in the art, and had been previous-

---

31. DX H, p. 2, communication from Patent Examiner, dated August 21, 1945.

ly performed on similar materials, e. g., by Hanztsch. In such circumstances, it was not necessary for Ritter to isolate, purify and identify his intermediate by chemical tests and analysis of the kind urged by defendant in order to reduce his invention to practice. "The reactions to be obtained could, therefore, be predicted with a reasonable assurance of accuracy and under such circumstances it is not necessary that the proof of identity of the products be as exhaustive as if entirely new substances or procedures were involved." Reiners v. Mehltretter, 236 F.2d 418, 421, 32 CCPA 1019 (1956); Guinot v. Hull, 204 F.2d 281, 40 CCPA 982 (1953).

Finally, test techniques which postdate Ritter's invention tend to establish that his postulation was indeed accurate and that he did produce his intermediate on or prior to the key date. Plaintiff contends that the imino compound can be conclusively identified today by the infrared and ultraviolet spectra and the nuclear magnetic resonator. Meyers testified that "we have taken the infrared spectrum of the imino compound, and there is no doubt that it has a very prominent peak in the infrared corresponding to the carbon nitrogen double bond and this was confirmed by many others besides myself" (Tr. 578–582, 587). Meyers' testimony on this point was in no way impeached on cross-examination (Tr. 763–64). Defendant introduced selected excerpts of Meyers' deposition into evidence. There Meyers testified that he could not distinguish the infrared spectrum of the imino from that of a protonated amide since, according to Meyers, they both have an N double bond C [32] (Tr. 823). There is nothing in the record, however, from which we can determine whether he was then referring to the product of the reaction where the concentration of the sulfuric acid was 88% or 96%, and without such evidence his deposition testimony is meaningless. In any event, there has not been the slightest sug-

gestion from any witness called by the defendant that a reaction using 96% to 100% sulfuric acid ever produced a protonated amide. Ritter said it would not (Tr. 653), and, significantly, Mark, who postulated "many" possible compounds, never gave a protonated amide in any of his examples. Further, Glikmans et al. have conducted independent research with the Ritter reaction, and they claim that they have isolated the Ritter intermediate and identified it as an imino compound (PX 18). There is earlier literature to the contrary, but the Glikmans study is the most recent (1966) and employs the most modern instruments for determining the presence of organic bonds.

We conclude, therefore, that these post-invention date tests do corroborate the fact that Ritter did produce an N-mono hydrocarbon substituted imino compound prior to December 4, 1944. The use of such post-invention techniques as an aid to the court in resolving the existence or non-existence of a physical phenomenon of the type involved here has been expressly approved in this circuit. Helene Curtis Industries, Inc. v. Sales Affiliates, Inc., 233 F.2d 148, 154–155 (2 Cir.), cert. denied, 352 U.S. 879, 77 S.Ct. 1011 (1956).

Accordingly, we find that Ritter did in fact perform his process and produce an N-mono hydrocarbon substituted imino compound by reacting the three components of his patent under its specified conditions before December 4, 1944.

The mere fact that Ritter's process successfully produced the N-mono hydrocarbon substituted imino compound does not establish reduction to practice. Before the key date Ritter had to demonstrate that this imino had utility. Reiners v. Mehltretter, supra, 236 F.2d at 421. "The inventor need prove only one practical use" to reduce his invention to practice. Conner v.

---

32. Contrary to Meyers' testimony, we find that a protonated amide does not have a true N double bond C. See pp. 353, 354.

Joris, 241 F.2d 944, 947, 44 CCPA 772 (1957). "But in order to establish utility of a product it is not necessary to show that it can immediately and without change perform a useful function. Products are useful if they serve as starting materials or intermediates in producing other materials or articles which are directly useful." Reiners v. Mehltretter, supra, 236 F.2d at 421–422.

N-mono hydrocarbon substituted imino compounds serve as intermediates in producing N-mono substituted amides. Several uses of N-mono substituted amides are described in Ritter's initial application, filed with the Patent Office on January 27, 1945 (DX H, p. 6). Those uses, and others, appear in Ritter's patent (PX 1, col. 4, lines 71–75; col. 5, lines 1–16). The first use given is that: "Some of the compounds herein described, for example, N-octyl acetamide and N-isobornyl acetamide are useful substitutes for camphor in the plasticizing of nitrocellulose."

N-octyl acetamide is produced by the patent's first four examples. Before the key date, Ritter performed the same process as Example I of the patent (PX 12, pp. 240, 246). Then he wrote, "I believe that these amides might have industrial value along several lines, as plasticisers, etc." He drew the formulas for camphor and for N-octyl acetamide and noted, "Similar molecular architectures?" (PX 12, p. 246.)

On November 22, 1944, at page 255 of his notebook,[33] Ritter ran the same process again and then proceeded to demonstrate that N-octyl acetamide is a useful substitute for camphor in the plasticizing of nitrocellulose:

"This was made for skin casting with NC dope, in collaboration with Mr. C. Snead. Skin-cast seems better (at least softer, more plastic) than camphor skin made at same time. Both were heated 7 hrs on steam radiator and the 'Camplex' sheet still showed up good as new. Will make 300 g to knead a block for skin shaving at Joe Davis plant, Arlington, N. J. Promised this next week."

Thus, before the key date, Ritter demonstrated that an N-mono substituted amide was directly useful. Accordingly, his imino intermediate was useful and so was his process.

Defendant also claims that some of Ritter's experiments did not employ the equal molecular amounts required by the

33. This demonstration of utility was never brought to our attention by either party at the trial. There, defendant cited Brenner v. Manson, supra, which involved a product whose utility was speculative and undemonstrated. Defense counsel applied *Manson* against the utility of the imino (Tr. 384–87) and only parenthetically against the utility of the amide (Tr. 387). Absent anything to call it to our attention, we did not know that Ritter had demonstrated utility in his notebook, but we were led to believe that the utility of N-mono substituted amides was so well known in 1944 that no demonstration was necessary. Accordingly, the court felt that the imino's utility was settled by Reiners v. Mehltretter, supra, 236 F.2d at 421–22. Therefore, the court stated that *Manson* was inapplicable (Tr. 384, 387).

Defendant did not clearly challenge the utility of N-mono substituted amides until its Post-Trial Brief, pp. 12–13. Oral argument was held on May 12, 1967 (Tr. 68, 71–72), and when defendant pressed the point the court offered plaintiff a chance to reopen the case to prove utility (May 12, Tr. 69). Plaintiff's attorney chose to "put Dr. Ritter on the stand right now" (May 12, Tr. 69), although he was as unprepared then as upon the trial. Obviously Ritter's recollection had not been refreshed. Ritter testified that he had not known any particular use for N-mono substituted amides before the key date (May 12, Tr. 75–76, 82). He obviously did not remember the 23 year old demonstration on page 255 of his notebook. Five days after oral argument, plaintiff's attorney called page 255 to our attention. The notebook, of course, was in evidence all along. It is plain that his attorney never read it (May 12, Tr. 57, 83–84). He did not direct Ritter's attention to page 255 of the notebook. Ritter consulted the notebook but on two other issues (May 12, Tr. 77, 80).

patent claims. The statement is true insofar as it refers to experiments conducted before he conceived his invention, at page 245 of his notebook, on November 6, 1944. There is no question that at page 245 Ritter does express his formula in molecular proportions, as defendant's expert Mark conceded (Tr. 545–46). Moreover, there can be no question that the notebook experiments, from November 6, 1944 through December 4, 1944 and afterward, employ molecular proportions, except where Ritter makes clear that he is deliberately experimenting with an excess; for example, PX 12, page 253. The mere fact that Ritter continued to experiment after he made his discovery of the need for molecular proportions in no way negatives invention. Moreover, the patent teaches that excesses can be used but usually are not because of economic reasons (PX 1, col. 2, lines 40 to 54). In the light of the evidence, this phase of defendant's argument is wholly untenable.

Finally, defendant contends that Ritter's tests were limited to a relatively few compounds and did not encompass the broad generic classes of reaction components claimed in the patent. There can be no question that Ritter's experiments were limited to a relatively few compounds and that each of the components of the patented process comprise numerous compounds running into the thousands (Tr. 771–73). Nonetheless, the evidence is clear that, insofar as pertinent to this reaction, all of the members of a class of each of the components have common properties and molecular structures which are critical to the reaction (Tr. 583–87). Against this, defendant has not named a single member of any of the three classes of compounds that was, or is, inoperative.

■ Once Ritter conceived the generalized imino formula,

$$\begin{array}{cc} RRCH & OSO_3H \\ | & | \\ RRC\!-\!N\!=\!C\!-\!R, \end{array}$$

a skilled chemist would have been satisfied that all known nitrile radicals and all known olefin radicals would work in their respective "R" positions, because nitriles and olefins were well known to be homologous series (Tr. 583–86), that is, they have common qualities. When chemical compounds have a common quality rendering each useful in the process patented, tests showing the operativeness of every member of that class are not required.[34]

■ We, therefore, conclude that plaintiff did conceive his invention and reduce it to practice before December 4, 1944 and that, therefore, French Patent No. 902,342 does not anticipate Ritter. We also conclude, for the same reasons, that Ritter's invention was, and is, operative. We turn, then, to the other prior art references.

### (2) Other Prior Art

■ A patented process must be "new and useful." 35 U.S.C. §§ 101, 102. Anticipation is a strictly technical defense. "Sections 101 and 102 prevent patentability only where the invention was 'identically disclosed' by the prior art."[35]

The mere fact that a process is "new and useful" does not mean that it is patentable; "[a] patent may not be obtained * * * if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to persons having ordinary

34. Libbey-Owens-Ford Glass Co. v. Celanese Corp., 135 F.2d 138, 145 (6 Cir.), cert. denied, 320 U.S. 744, 64 S.Ct. 46, 88 L.Ed. 442 (1943) ; Corning Glass Works v. Anchor Hocking Glass Corp., 253 F.Supp. 461, 477 (D.Del.1966).

35. Ling-Temco-Vought, Inc. v. Kollsman Instrument Corp., 372 F.2d 263, 267 (2 Cir. 1967) ; Buxton, Inc. v. Julen, Inc., 223 F.Supp. 697 (S.D.N.Y.1963).

skill in the art to which the subject matter pertains." 35 U.S.C. § 103.

In order to resolve the ultimate legal question, the court must make three preliminary factual determinations: (1) the scope and content of the prior art; (2) the differences between the claims and the prior art; and (3) the level of ordinary skill in the pertinent art at the time the invention was made.[36] In making these factual determinations, the court must guard against stepping into use of hindsight and resist the temptation to read into the prior art the teachings of the invention in issue. In order to filter out the hindsight which permeates much of the testimony, we must undertake the task of mining the facts respecting the state of the prior art as of 1944 from the texts of the references themselves. We shall be forced to go into much technical detail, for the art prior to Ritter was not clear and generalized, but obscure, confused, and fragmented.

### (a) The Wieland and Dorrer Article

Defendant's second prior art reference is an abstruse scholarly paper by Heinrich Wieland and Eugen Dorrer of the Bavarian Academy of Science, published in 1930 (DX I, Tab 8). Parts of this paper contain uncanny hunches. Parts leave blatant contradictions unexplained and would lead a reader down many dead ends. Other parts are so plainly wrong that a skilled chemist would not find them heuristic at all.

Wieland and Dorrer were exploring Friedel-Crafts chemistry, which involves using aluminum chloride ($AlCl_3$) and hydrogen chloride (HCl) in a variety of reactions (Tr. 455–56; Roberts-Caserio, Modern Organic Chemistry 548 (1967)). The experiments involved here were a continuation of two of their earlier papers (see DX I, Tab 8, n. 1), which had established that *enols*, in the presence of aluminum chloride and hydrogen chloride, combine with hydrocyanic acid (HCN) to form aldimines. Now they were trying to demonstrate that non-aromatic *olefins* can combine with hydrocyanic acid (which is a nitrile) under the same conditions. They used atmospheric pressure and cool (freezing) temperature, as Ritter often does.

Wieland and Dorrer ran this reaction with only four different olefins: cyclohexene, asymmetric diphenyl ethylene, stilbene, and styrene. They were trying to demonstrate that the four olefins would react the same way. Instead, each one reacted differently.

### (i) Wieland and Dorrer's Reaction with Cyclohexene

This reaction came closest to the process which Ritter patented. Wieland and Dorrer reacted cyclohexene with HCN and HCl in the presence of the catalyst $AlCl_3$ and the solvent benzene. The resulting "batch" was left standing for six hours. Then an excess of ice was added. Then one of the products was extracted and distilled (DX I, Tab 8, pp. 7–8). Chemical analysis showed that each molecule contained 7 carbon atoms, 13 hydrogen, 1 oxygen, and 1 nitrogen (DX I, Tab 8, p. 7). Wieland and Dorrer, at page 2, formula VII, formulated this compound as:

This is a species of the N-mono substituted amides, the genus taught, but not

---

36. Graham v. John Deere Co., 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966); Ling-Temco-Vought, Inc. v. Kollsman Instrument Corp., supra; Formal Fashions, Inc. v. Braiman Bows, Inc., 369 F. 2d 536 (2 Cir. 1966).

claimed, by Ritter's patent (Tr. 518, 881). Their general formula is:

$$RRCH$$
$$RRC—N—C—R. \quad [37]$$
$$\overset{|}{H} \quad \overset{\|}{O}$$

Wieland and Dorrer called this compound "N-formyl cyclohexyl amine." Since this label is an alternate way to express "N-mono cyclohexyl substituted formamide" (May 12, 1967) Tr. 34–37; see PX 12, pp. 254–55), a skilled chemist would have understood that Wieland and Dorrer's product was an N-mono substituted amide (Tr. 518, 622, 881).

Wieland and Dorrer postulated that this amide had been preceded by cyclohexyl formimido (hydro) chloride, which is a species of the genus which Ritter later called the "N-mono hydrocarbon substituted imino compounds" (Tr. 520). They were unable to isolate this imino intermediate. They apparently thought that the isolation was prevented only because of the AlCl₃ (DX I, Tab 8, p. 3).

### (ii) *Wieland and Dorrer's Reaction with Asymmetric Diphenyl Ethylene*

The same reaction was run, except that asymmetric diphenyl ethylene was used as the olefin. This is a conjugated olefin.[38] Hence, it is not encompassed by Ritter's claims.[39] However, it presumably would work in the Ritter process.[40]

In Wieland and Dorrer's process, after the ice hydrolysis a product was formed. Wieland and Dorrer analytically demonstrated that this product was alpha, alpha-diphenyl propionitrile (DX I, Tab 8, p. 2, formula IV). This is a nitrile. Wieland and Dorrer, because of their previous work with enols,[41] had expected to get chloroaldimine (DX I, Tab 8, p. 2, formula II). On page 2 they speculated that formula IV had been *preceded* by chloroaldimine and that chloroaldimine had been preceded by formimide chloride (no formula given). Neither chloroaldimine nor formimide chloride is an N-mono hydrocarbon substituted imino compound. Chloroaldimine is a

---

37. PX 1, col. 3, line 11, right hand part of Equation III. Ritter's right hand "R" represents, as do all his "R"'s, any hydrocarbon radical. In Wieland and Dorrer's formula VII, this radical is the H farthest to the right. Also, any chemist looking at Wieland and Dorrer's formula VII would know that the atoms
"CH—NH—CH=O"
were bonded the way Ritter less cryptically shows them,

$$"C—N—C—R," "$$
$$\overset{|}{H} \quad \overset{\|}{O}$$

because a chemist would know that the valence of N is 3, of H is 1, of C is 4, and of O is 2.

38. "Compounds with alternating double and single bonds are said to have *conjugated* double bonds." Roberts-Caserio, Modern Organic Chemistry, p. 123. The same book, at p. 537, gives the formula for this compound's isomer, stilbene:

39. Ritter claimed only "an unsaturated hydrocarbon from the group consisting of non-conjugated alkenes having at least three carbon atoms, cyclic terpenes and mono-aryl substituted non-conjugated alkenes." Claims 1, 2 and 3.

40. Defendant never refuted (May 12, 1967, Tr. 27) Meyers' testimony that any ethylenic compound with less than fifteen carbon atoms will work in the Ritter process (Tr. 772), that he did not know any specific nitrile or alkene which would not work, and that although undoubtedly *some* nitriles and alkenes will not work, they are not available to the chemist to use (Tr. 773). Corning Glass Works v. Anchor Hocking Glass Corp., supra, 253 F.Supp. at 477, made the same presumption we make in the text against the same defense counsel for the same reason.

41. DX I, Tab 8, pp. 1–2.

C-mono chloro-hydrocarbon substituted imino compound (Tr. 607). Formimide chloride is an unsubstituted imino compound (Tr. 606). Nevertheless, both are fairly close to Ritter's intermediate. Formimide chloride *should* have been formed in this reaction, and it *should* have been followed by some kind of substituted imino compound (Tr. 622, 881). However, we are convinced that no imino of any kind *was* formed in the reaction as Wieland and Dorrer performed it.

Although this part of Wieland and Dorrer speculates almost the same intermediate as Ritter, the end product of this experiment is completely different from the amide taught by Ritter. Wieland and Dorrer probably felt that their imino intermediates were formed before the ice hydrolysis, although they do not clearly say so. Therefore, they are saying that in this particular experiment the hydrolysis rebuilds the carbon-nitrogen double bond back again to a triple bond![42] Ritter, Hanztsch,[43] and all the other evidence in this case[44] teach that hydrolysis breaks the carbon-nitrogen double bond down further into a single bond. We are convinced that Wieland and Dorrer's experiment with asymmetric diphenyl ethylene, which indisputably produced a nitrile, did not go through any imino intermediate, although it should have. This was simply one of those experiments that "go haywire."[45]

Nevertheless, Wieland and Dorrer "correctly" speculated the iminos which *should* have occurred. Another fascinating aspect of their speculation is that they realized what Gresham later failed to realize, namely, that the acid was entering the reaction (DX I, Tab 8, p. 2). This was hard to realize because the negative ion of the acid was attaching and then splitting off.

However, both of these remarkable speculations about the iminos and the acid were based on knowledge which was peculiar to *chlorine* chemistry, and a skilled chemist would have seen that they were.[46] There is no evidence that anyone before 1944 could have applied this knowledge to speculations about *sulfuric* acid reactions.

### (iii) *Wieland and Dorrer's Reaction with Stilbene*

Stilbene is the "trivial" name for the symmetric isomer of asymmetric diphenylethylene; it is less reactive because its double bond is in a less exposed position (DX I, Tab 8, p. 5). Like its isomer, it is conjugated and is not encompassed by Ritter's claims.[47] In Ritter's process, stilbene presumably would combine with the nitrile (HCN).[48] In Wieland and Dorrer's process, stilbene failed to combine with the nitrile. It simply dimerized, i. e., combined with its own molecules.

---

42. There is an unexpressed triple bond between the C and the N in formula IV.

43. PX 19; Hanztsch's iminos were unsubstituted (Tr. 564), just like Wieland and Dorrer's formimide chloride.

44. Mark, Tr. 276–77; Bortnick, Tr. 958. See DX AA and the progression from formula I to II to III.

45. Compare Ritter, Tr. 261.

46. Previous articles (cited in DX I, Tab 8, p. 1, n. 2) had established that the negative component of HCN normally goes into beta position. It went into alpha position in this experiment. By analogy to the Gattermann reaction of aromatic aldehydes with HCN, HCl, and $AlCl_3$, Wieland and Dorrer decided (DX I, Tab 8, p. 2) that the beta position had been occupied temporarily by a chlorine atom. When they go on to say that the chlorine was supplied in the form of chloroaldimine (formula II), they are begging the question of the entire experiment, namely, whether olefins *will* react analogously to aromatic aldehydes and enols.

47. See n. 38; n. 39.

48. See n. 40.

(iv) *Wieland and Dorrer's Reaction with Styrene*

Styrene is another conjugated olefin.[49] However, it worked very well in Ritter's process,[50] and Ritter claimed it specially in claims 11, 12, and 15. In Wieland and Dorrer's process, the styrene failed to combine with the nitrile. It simply polymerized, i. e., combined with its own molecules.

(b) *The Legal Effect of Wieland and Dorrer Upon Ritter's Patent*

(i) *Anticipation*

The crucial issue under Wieland and Dorrer is obviousness. However, we shall first deal with the issue of anticipation. This issue was raised obliquely by some of defense counsel's questions, which implied that Wieland and Dorrer's HC1 + A1C1₃ directly anticipates Ritter's $H_2SO_4$ because both are cationoid compounds.

▮▮▮▮ Anticipation, unlike obviousness, looks only to complete units and therefore considers references separately, one by one.[51] It is hornbook patent law that if a reference would have infringed, if later, it anticipates, if earlier.

Wieland and Dorrer's process, if later, would *not* have infringed the Ritter patent. Their HCN would read on Ritter's claims ("a nitrile," "hydrogen cyanide"). Two of their four olefins would read on

Ritter's claims.[52] However, their HC1 + A1Cl₃ would *not* read on Ritter's claims: "a cationoid compound from the group consisting of sulfuric acid, hydrocarbon sulfonic acids and alkyl sulfuric acids." (Claims 1, 2, and 3.)

Moreover, all of Wieland and Dorrer's imino compounds are imino *chlorides*. None of them would read on Ritter's claims. The "N-mono hydrocarbon substituted imino compounds" in Ritter's claims are clearly limited to N-mono hydrocarbon substituted imino *bisulfates* and *sulfonates*, because Ritter limited his cationoid compounds to acids whose negative ions are either $OSO_3H$ or $SO_3$.

▮▮▮ Defendant argues (May 12, 1967 Tr. 40–42) that if Wieland and Dorrer had been later than Ritter, and if Ritter had sued them for infringement, Ritter would have won on the doctrine of equivalents. However, the doctrine of file wrapper estoppel prevents resort to those "equivalents" which were given up in the patent application proceedings.[53] Ritter's original application tried to claim "a cationoid compound" (DX H, p. 15), and Wieland and Dorrer's HC1 + A1Cl₃ would have read on that. However, Ritter gave up all but the subgenus of –HSO₃ acids.[54] He did not limit his claim to avoid Wieland and Dorrer, which was never mentioned in the Patent Office proceedings. He limited it to avoid the Patent Examiner's objection

---

49. See n. 38. Roberts-Caserio, Modern Organic Chemistry, p. 537, gives the formula for styrene:

50. PX 1, col. 1, line 37; Examples XXI, XXVI, XXXV, and XXXVII.

51. Soundscriber Corp. v. United States, 360 F.2d 954, 960 (Ct.Cl.1966) ; Preformed Line Products Co. v. Fanner Mfg. Co., 328 F.2d 265 (6 Cir.), cert. denied, 379 U.S. 846, 85 S.Ct. 56, 13 L.Ed.2d 51 (1964) ; Firestone v. Aluminum Co. of America, 285 F.2d 928 (6 Cir. 1960). Contra, McCullough Tool Co. v. Wells Surveys, Inc., 343 F.2d 381 (10 Cir.

1965), cert. denied, 383 U.S. 933, 86 S. Ct. 1061, 15 L.Ed.2d 851 (1966).

52. Cyclohexene would read on Claims 1, 2, 3, 4 and 13: "an unsaturated hydrocarbon from the group consisting of non-conjugated alkenes having at least three carbon atoms, cyclic terpenes, and mono-aryl substituted non-conjugated alkenes." Styrene would read on Claims 11, 12 and 15: "styrene." Neither stilbene nor asymmetric diphenyl ethylene would read on Ritter's claims. See nn. 38 and 39.

53. See Ling-Temco-Vought, Inc. v. Kollsman Instrument Corp., supra, 372 F.2d at 270; Stiegele v. J. M. Moore Import-Export Co., 312 F.2d 588 (2 Cir. 1963).

54. Claims 1, 2 and 3. See also PX 1, col. 2, lines 27–39.

that "a cationoid compound" was indefinite (DX H, p. 20). After this limitation, Ritter had good reason to be confident that his invention was still securely protected, for in this reaction sulfuric acid has special properties not found in other cationoid compounds. It serves as a catalyst and a solvent as well as a reagent (Tr. 586) and thus eliminates expense and side reactions by eliminating the need for a catalyst and, in some cases, the need for a solvent. The other cationoids were interesting theoretically, but not commercially. Ritter was not being artificial when he limited his claim to acids containing an $-HSO_3$ group.

■ Moreover, under the doctrine of equivalents, the alleged infringer must obtain "substantially the same results" as the results claimed by the patentee.[55] Ritter's "results" are his iminos, not the amides whose production he was unable to claim. None of Wieland and Dorrer's imino chlorides are substantially the same as Ritter's imino bisulfates and sulfonates. Ritter testified on deposition that an imino chloride is equivalent to his imino bisulfate (Tr. 653–54). This was a clearly erroneous conclusion of law because it was based on another erroneous conclusion of law, namely, that chloride cationoid substances can be used under the Ritter patent (Tr. 653–54), but, as we have shown above, they cannot.

Therefore, Wieland and Dorrer, if later, would not have infringed Ritter. They do not anticipate Ritter. Ritter's process was novel.

(ii) *Obviousness*

In light of all the prior art, was Ritter's process obvious to a skilled chemist in 1944?

Of Wieland and Dorrer's four experiments, only one, the one with cyclohexene,

pointed in the right direction. We must look at the reference as a whole; we cannot ignore the parts that failed.[56] Therefore, we must first decide whether a skilled chemist would have realized that the teachings of the cyclohexene experiment were a reliable basis for further inquiry.

A skilled chemist, confronted with Wieland and Dorrer's two experiments with cyclohexene and asymmetric diphenyl ethylene, would have realized that one or the other had gone haywire. (Wieland and Dorrer virtually admit that the stilbene and styrene experiments went haywire (DX I, Tab 8, p. 1, third paragraph).) There is no other way to explain how one postulated imino hydrolyzed to an amide, while the other postulated imino hydrolyzed to a nitrile. Wieland and Dorrer did not attempt to explain, nor did defendant. Wieland and Dorrer had expected that both experiments would produce analogous intermediates and presumed that they had, although they patently had not. Hence, there is some justification for Dr. Meyers' comments that they "were wrong" (Tr. 767–68) and "had no idea what they had done" (Tr. 766), although plaintiff's counsel did not bother to elicit an explanation of these conclusory remarks.

Next, a skilled chemist would probably have realized that the experiment which had gone haywire was the one with asymmetric diphenyl ethylene. This reaction had been obscured by two side reactions.[57] A skilled chemist would probably have also realized that the cyclohexene experiment might reward further inquiry. Wieland and Dorrer paid more attention to this experiment. They repeated the experiment with a different solvent. By doing so, they eliminated three side reactions,[58] reduced the unde-

55. Graver Tank & Mfg. Co. v. Linde Air Products Co., 339 U.S. 605, 608, 70 S.Ct. 854, 94 L.Ed. 1097 (1950).

56. Application of Shuman, 361 F.2d 1008 (C.C.P.A.1966); Application of Foster, 343 F.2d 980 (C.C.P.A.1965).

57. DX I, Tab 8, p. 1, fourth paragraph; p. 2, second paragraph.

58. DX I, Tab 8, pp. 7–8.

fined resinous end products from 50% to 20%, and obtained, in addition to the amide, only one defined side product which was easily separated.[59]

Therefore, we find that a skilled chemist would have realized that the teachings of the cyclohexene experiment were a reliable basis for further inquiry.

If a skilled chemist in 1944 looked at Wieland and Dorrer's cyclohexene experiment, would the Ritter process have been obvious to him?

Wieland and Dorrer teach that the $AlCl_3$ is not intended to enter the reaction but is added because otherwise the HCl is unable, for some reason, to be a proton donator (Tr. 536–37, 539; DX I, Tab 8, p. 2, first full paragraph). Proton donators are called "cationoid compounds" (May 12, 1967 Tr. 38). Ritter was the first to discover that cationoid compounds other than HCl could produce substituted imino compounds. According to defendant, the Ritter process merely replaces Wieland and Dorrer's cationoid compound with another cationoid compound, albeit a much more practical one. "It is hornbook law that the

substitution of recognized equivalents in a process is not invention and is a classic example of what is an obvious change * * *." (Defendant's Post-Trial Brief, p. 16.)

Defendant thus concedes, as it must,[60] that Ritter's $H_2SO_4$ was not obvious unless it was a *recognized* equivalent of Wieland and Dorrer's HCl. We turn, therefore, to the issue of whether a skilled chemist in 1944, looking at Wieland and Dorrer's cyclohexene experiment, would have realized that in that experiment $H_2SO_4$ would have performed substantially the same *function* as HCl in substantially the same *way* to obtain substantially the same *results*.[61]

The ultimate *function* of Wieland and Dorrer's HCl is not simply to donate a proton. Its ultimate function is to attach a proton (its hydrogen ion) to one of the carbon atoms of the carbon-carbon double bond in the cyclohexene, *and* to attach its negative ion to the carbon atom which used to be part of the nitrile and which is now doubly bonded to the nitrogen. Today, after Ritter, it is clear that $H_2SO_4$ performs the same ultimate function.[62]

---

59. DX I, Tab 8, p. 8.

60. Application of Edge, 359 F.2d 896, 898–899 (C.C.P.A.1966).

61. Graver Tank & Mfg. Co. v. Linde Air Products Co., supra, 339 U.S. at 608, 70 S.Ct. 854.

62. Wieland and Dorrer began with cyclohexene. A chemist would know that its formula is:

See Roberts-Caserio, Modern Organic Chemistry, p. 181. The formulas given in DX I, Tab 8, p. 2, do not represent

steps in a mechanism. Wieland and Dorrer teach that the imino (Formula VI) is preceded, not by Formula V, but by cyclohexene, HCN, and HCl. Looking at Formula VI,

we can see that the left part used to be the cyclohexene. By now, one hydrogen atom from the HCl has attached to one of the carbon atoms of the cyclohexene's carbon-carbon double bond, the double bond has changed to a single bond, and the chlorine atom from the HCl has attached to the carbon atom which used to

The *way* in which the HC1 performs this function is not clearly explained by Wieland and Dorrer. However, defendant has in no way refuted Meyers' testimony that the HC1 first combines with the nitrile to form an unsubstituted imino chloride, which then combines with the olefin to form a substituted imino chloride.[63] In fact, Wieland and Dorrer teach exactly this mechanism for the reaction with asymmetric diphenyl ethylene.[64]

The way in which $H_2SO_4$ performs its ultimate function is completely different. First, the hydrogen ion from the $H_2SO_4$ combines with the olefin to form a carbonium ion, and next, the carbonium ion attaches to the nitrile and so does the $OSO_3H$ ion (PX 1, col. 1, lines 9–12; col. 3, formula I; PX 12, p. 245). In other words, $H_2SO_4$ goes through a different mechanism than does Wieland and Dorrer's HC1.

Thus, in fact, $H_2SO_4$ performs the same function as HC1, but in a different way. Would a skilled chemist in 1944 have realized this?

It was known in 1944 that both $H_2SO_4$ and HC1 + A1C1$_3$ could donate hydrogen ions, as defendant asserts.[65] However, in the olefin-nitrile reaction, their function is not simply to donate a hydrogen ion. Their function, as we have shown, is to donate a hydrogen ion to a particular atom *and* to donate a negative ion to another particular atom. Therefore, the question facing the skilled chemist in 1944 was not whether $H_2SO_4$ will, in general, donate a hydrogen ion, but whether in this particular reaction, in the presence of a nitrile, $H_2SO_4$ will donate a hydrogen ion to one of the carbon atoms of the carbon-carbon double bond in the cyclohexene *and* will donate an $OSO_3H$ ion to the carbon atom which used to be part of the nitrile and which is now doubly bonded to the nitrogen. We find that a skilled chemist in 1944 could not have answered this question.

The work of Hanztsch would not suggest the answer, because it does not suggest what effect an olefin would have upon his acid-nitrile reaction. The

be part of the nitrile and which is now doubly bonded to the nitrogen.

We see the same thing in Ritter's patent, PX 1, col. 3, line 5, Equation I:

$$\begin{array}{c} RRC \\ \| \\ RRC \end{array} + N\!\equiv\!C\!-\!R + H_2SO_4 \longrightarrow \begin{array}{cc} RRCH & OSO_3H \\ | & | \\ RRC\!-\!N\!=\!C\!-\!R \end{array}$$

One hydrogen atom from the $H_2SO_4$ has attached to one of the carbon atoms of the olefin's carbon-carbon double bond, the double bond has changed to a single bond, and the $OSO_3H$ ion from the $H_2SO_4$ has attached to the carbon atom which used to be part of the nitrile and which is now doubly bonded to the nitrogen.

63. Tr. 621–22, 881. DX I, Tab 8, p. 8, third full paragraph ("the addition reaction of HC1 with the carbon double bond of the cyclohexene") refers, not to the imino reaction, but to the side reaction resulting in cyclohexylchloride.

64. DX I, Tab 8, p. 2. In describing the cyclohexene reaction, Wieland and Dorrer

do not mention the unsubstituted imino chloride. They do not explain this omission. At Tab 8, p. 3, they say the substituted imino chloride is formed "first," but in view of the context it is likely that a better translation would have used a narrower word: "before [the amide]."

65. Defendant never backed up this assertion with direct proof. However, Wieland and Dorrer taught (DX I, Tab 8, p. 2, first full paragraph) that HC1 is a proton donator, and Whitmore taught that $H_2SO_4$ is a proton donator (Tr. 562–63; DX I, Tab 1). Of course, until Ritter, it was unknown whether $H_2SO_4$ would donate a hydrogen ion to an olefin when a nitrile was also present.

work of Whitmore would not suggest the answer, because it does not suggest what the hydrogen ion would do in the presence of a nitrile, nor what the $OSO_3H$ ion would do. Gresham used $H_2SO_4$, but he taught that it was a catalyst and not a reagent. Wieland and Dorrer realized that their acid (HCl) was a reagent, but, as we said, this teaching would not have seemed applicable to $H_2SO_4$, because it was based on knowledge peculiar to chlorine chemistry.

A skilled chemist would have had no reason to connect the work of Whitmore with the work of Wieland and Dorrer. He would have known that HCl combines first with the nitrile (Tr. 621–22, 881; DX I, Tab 8, p. 2), rather than with the olefin, whereas Whitmore's $H_2SO_4$ combines with the olefin, and no one knew how this would be affected by the presence of a nitrile.

The only person who could have answered the question in 1944 would have been a person who (1) could synthesize the teachings of Hanztsch and Whitmore, and (2) could demonstrate that the olefin and the nitrile will eventually combine, even if the acid first attacks the olefin rather than the nitrile. This inventive insight and this demonstration had been missed for twelve years, and they were finally made by Ritter.

Moreover, a skilled chemist looking at Wieland and Dorrer might well have concluded that the imino compounds were produced only because of some special properties of $AlCl_3$. The chemistry of HCl + $AlCl_3$, Friedel-Crafts chemistry, is a very special area. Defendant in no way disputed Meyers' testimony that not much is known about $AlCl_3$ even today (Tr. 621–22). Certainly Wieland and Dorrer seem to have thought that $AlCl_3$ was indispensable. They knew, as any chemist would have

known, that $H_2SO_4$, unlike HCl, does not need $AlCl_3$ to make it cationic (Tr. 536–39). They also knew, as any chemist would have known, that only the $AlCl_3$ was forcing them to exclude air and water (Tr. 455–56). They mainly blamed the $AlCl_3$ for the side reactions and the abortion of the stilbene and styrene reactions.[66] Yet they persisted in using HCl + $AlCl_3$ and never thought of substituting another cationoid compound. True, they were concentrating on Friedel-Crafts chemistry, and they were not interested in commercial uses (Mark, Tr. 459–60). Nevertheless, N-substituted amides are also of great interest in the laboratory (Tr. 619). If an easy way to produce them had been obvious to Wieland and Dorrer or anyone else, they would not have passed it up.

In summary, it was obvious that the results would be greatly improved *if* $H_2SO_4$ could be substituted, so obvious that we are convinced that it was not obvious that $H_2SO_4$ *could* be substituted. We find that a skilled chemist in 1944 would not have realized that $H_2SO_4$ would perform the same function as Wieland and Dorrer's HCl.

Accordingly, we find that in 1944 $H_2SO_4$ and HCl were not "recognized equivalents." Even if they were, this would only show that a process for producing cyclohexyl formimido bisulfate was obvious. It would not show that Ritter's patented process was obvious. That process can produce at least a million[67] different N-*mono* hydrocarbon substituted imino bisulfates and sulfonates, because Ritter realized that the reaction will run with any nitrile and almost any olefin.

Gresham used any nitrile and almost any olefin; Whitmore used any olefin; Hanztsch used any nitrile. However, as we have shown above, no one would have

66. DX I, Tab 8, p. 1, third paragraph; p. 2, second full paragraph; p. 3, first sentence; p. 8, third full paragraph.

67. The olefins claimed by Ritter number in the thousands; so do the nitriles (Tr. 770–73). Since any of Ritter's olefins will combine with any of his nitriles, and since both the olefin's radical and the nitrile's radical are present in Ritter's imino, there are at least a million different species of this imino.

seen the relevance or the relatedness of those teachings unless one had already conceived the inventive synthesis of Whitmore and Hanztsch. Significantly, defendant did not cite Hanztsch as a prior art reference. It included a short paper by Whitmore in defendant's Exhibit I to show the state of the art, but never discussed Whitmore. To an ordinarily skilled chemist, the only relevant reference would have been Wieland and Dorrer. They used only one nitrile, HCN. They had expected that any olefin would work, but their experiments indicated that only one worked. The ordinarily skilled chemist would have had no reason to believe, in the teeth of Wieland and Dorrer's three failures, that every nitrile can be made to combine with every olefin in the same way. That was the core of Ritter's invention. Once he made it, he formulated the generalized molecular structure on the right of the first equation in column 3 of his patent. That formula fixes a specific position for the radical from the nitrile and a specific position for the radical from the olefin. *Only after this formula had been conceived* could anybody make use of the knowledge that, *given a specific position,* both nitriles and alkenes will function homologously.[68]

Accordingly, we find that if a skilled chemist in 1944 had looked at Wieland and Dorrer's article, with the benefit of all intervening knowledge, the Ritter process would not have been obvious to him.

### (c) *The Gresham Patent*

The third prior art reference upon which defendant relies is a United States patent granted to Gresham, No. 2,457,-660, in December 1948. Following the approach previously outlined, we first determine the teachings of the Gresham patent.

Gresham teaches the "synthesis" of amides by reacting olefins and nitriles "in an aqueous medium, containing about 1 to 20%, based upon the weight of water present, of an acid-reacting catalyst" (DX I, Tab 7, col. 4, lines 16–19; see file wrapper, DX K). The preferred acid concentration is 5 to 10%. The reactants are heated, usually in the presence of the "acid catalyst," resulting directly in the formation of an amide. The catalyst is not deemed essential; "the reaction takes place to some extent in the absence of the added catalyst" (DX I, Tab 7, col. 2, lines 1–3). No particular proportion of reactants is required. Gresham does not disclose any mechanism, nor otherwise explain how this reaction proceeds to the formation of an amide. The formation of an imino compound, transient or otherwise, is not suggested. The maximum yield of amide is roughly 10%.

Defendant contends that Ritter reacts the same ingredients, and obtains the same ultimate product, as Gresham, and has simply split into two steps what Gresham did in one. It asserts that Ritter is not more efficient or practical than Gresham, and that Gresham is "on all fours" with Ritter and therefore anticipates. Further, defendant argues that, even if Ritter is an improvement over Gresham, it does not rise to the level of a patentable difference over the prior art but is obvious. Finally, defendant claims that it was only by submitting a "misleading" and "deceptive" affidavit to the Patent Examiner, purporting to compare the results of the Gresham and Ritter processes, that Ritter was able to overcome the Examiner's initial finding of obviousness and obtain his patent.

Gresham was cited against Ritter by the Examiner in the patent proceedings. Plaintiff, therefore, asserts that "the rule of law is that the Patent Office must be clearly shown to have been erroneous." (Plaintiff's Brief, p. 34.) Further, he argues that Gresham is a mere "paper patent," commercially worthless, unlike Ritter. Finally, he

---

68. Tr. 584–86. Presumably Hanztsch taught that nitriles are homologous, and Whitmore taught that olefins are homologous.

contends that Ritter is a significant advance over the prior art, a new and non-obvious method of producing *imino compounds*.

In light of the debatable and uncertain status of the "presumption of validity"[69] (particularly when some of the most important prior art, Wieland and Dorrer, was not before the Patent Examiner), we attach no "presumptions" whatsoever to the Ritter patent. Likewise, the fact that Gresham may be a "paper patent" is immaterial for it may still anticipate.[70] We turn, therefore, to the factual differences between Ritter and Gresham in light of the prior art.

The evidence is clear that there are many differences between the two processes. Ritter, although teaching a two-step process resulting in the formation of amides, *claimed* only the first step, the production of the imino compound. This compound is neither described, nor suggested, by Gresham. Nor does the ultimate production of amides, standing alone, indicate its formation (Tr. 690). Ritter requires "substantially anhydrous conditions" to produce the imino compound; Gresham specifies an "aqueous solution"—one including large amounts of water—to produce an amide. Ritter explicitly teaches that the sulfuric acid is a reactant and that, as with the other ingredients, molar proportions should be used. Gresham labels the acid a catalyst and declares that it is not strictly necessary to use acid for the reaction to work.

Despite all these differences, defendant asserts that Gresham anticipates Ritter because, contrary to the express teaching of the Gresham patent, one of its examples is an "anhydrous" reaction and therefore duplicates Ritter identically. Example 2 of Gresham reacts tertiary butanol (an alcohol), hydrogen cyanide (a nitrile), and a small amount of sulfuric acid (DX I, Tab 7, col. 2, lines 40–55). Dr. Mark testified that this sulfuric acid was "concentrated" (96% – 100%) because this is what the unqualified term "sulfuric acid" means to a chemist, and if Gresham meant that the acid was to contain more water, he would have so stated (Tr. 540–42). Thus, it is true that no water is used in this example as an initial ingredient. However, Dr. Mark admitted that an alcohol in strong sulfuric acid produces water and that this was known in 1944 (Tr. 543). The Ritter patent teaches that "the primary reaction [the production of the imino] should be carried out in the substantial absence of water *or substances capable of producing water under the reaction conditions.*" (PX 1, col. 3, lines 53–56 (emphasis added).) A reaction which uses an alcohol instead of an olefin is clearly not "anhydrous." This reaction, like all the rest of Gresham's reactions, is not anhydrous, does not "identically disclose" Ritter's process, and therefore does not anticipate it.[71]

We turn to the more difficult question of obviousness. Ritter's process is definitely a practical advance over Gresham's. Gresham, unlike Ritter, requires heating and high pressures which are expensive disadvantages in a chemical process (Mark, Tr. 487–88; Meyers, Tr. 630–31). Gresham requires a much longer reaction time than Ritter. Finally, the yields Ritter states he obtains, 95% to 40%, are far larger than Gresham's, which range from infinitesimal to approximately 10%.[72]

69. Compare the majority opinion in Ling-Temco-Vought, Inc. v. Kollsman Instrument Corp., supra, 372 F.2d at 268, with the dissenting opinion at 275. See Graham v. John Deere Co., supra, 383 U.S. at 18, 86 S.Ct. 684, 15 L.Ed.2d 545.

70. Ling-Temco-Vought, Inc. v. Kollsman Instrument Corp., supra, 372 F.2d at 266; Application of Blake, 352 F.2d 309 (C.C. P.A.1965).

71. Ling-Temco-Vought, Inc. v. Kollsman Instrument Corp., supra, 372 F.2d at 267.

72. Ritter patent, PX 1, Examples 1–37; Gresham patent, DX I, Tab 7, Examples 1–6. Dr. Mark calculated the yields of some of Gresham's examples to be over 100% by basing his analysis on the amount of catalyst present (Tr. 526, 530). Dr. Meyer testified that the yields of reactions were not properly calculated on

Defendant has put forth no evidence to disprove the (seemingly obvious) advantage of a reaction that readily and quickly proceeds at room temperature and pressure. It vigorously contends, however, that it has never been established that Ritter actually gives better yields than Gresham. To prove higher yields, Ritter relies mainly on an affidavit submitted by him to the Patent Examiner, purporting to provide experimental proof that his process gave much higher yields than Gresham's (DX G, pp. 55–57). Defendant claims (1) that this affidavit does not show higher yields because it is misleading and distorted, and (2) that it does establish that Ritter had such unclean hands in dealing with the Patent Examiner that his right to enforce the patent is foreclosed.

■ For convenience, we now consider this affidavit under both contentions: its failure to show a more efficient process than Gresham (no patentable improvement), and its misleading nature (the patent should be unenforceable because of "unclean hands"). The first issue is one of fact alone—what does the affidavit prove? The second issue, unclean hands, involves questions of law. The maxim that he who comes into equity must come with clean hands demands that those who deal with the Patent Office must have acted fairly and without fraud or deceit in obtaining a patent. A court will, therefore, refuse to enforce a patent if it finds that the patentee made intentional misrepresentations to the Patent Examiner.[73]

Defendant attacks the accuracy of the affidavit in three respects: (1) in duplicating Gresham example 4, Ritter used di-isobutylene rather than the more reactive isobutylene taught by Gresham; (2) Ritter's example involves the use of a solvent, whereas Gresham does not; and (3) Ritter inaccurately determined the yield of the Gresham example. Defendant concedes, as it must, that all the facts stated in the affidavit are true. Ritter meticulously informed the Patent Examiner of the methods and conditions employed in making the comparison. He specifically pointed out that he used di-isobutylene rather than isobutylene in duplicating example 4 of Gresham (DX G, p. 56).

Gresham, like Ritter, teaches the use of a large class of olefins. Obviously, a fair comparison of the two processes requires the use of the *same* olefin in both. Example 1 of Ritter, the example compared to Gresham's example 4, employs di-isobutylene (PX 1, col. 5, line 20). Dr. Mark admitted on cross-examination that it is sensible to use this same olefin in duplicating Gresham (Tr. 470–71). Certainly Ritter could have made the reverse substitution (using isobutylene in both examples). In view of the broad class of olefins taught by Gresham, the court cannot see what possible difference it makes which particular olefin Ritter chose, as long as he used the same one in both processes.

In example 2 of Ritter, which uses no solvent, the yield is 50%. In example 1, with a solvent, the yield is 95%. Gres-

---

the amount of catalyst involved, but on the amount of reactants that form the product sought (Tr. 626–27). This testimony was not rebutted, and the court finds that the proper measure of the yield of Gresham is to compare the yield with the molar amount of initial olefin or nitrile present. Even assuming that the sulfuric acid is a reactant and not a catalyst in Gresham (see Mark, Tr. 526–29), it is inaccurate to base the calculation of the yield on the amount of acid present, because there is no showing that under Gresham conditions, the acid reacts in molar amounts. Indeed, it seems doubtful that it does, because external

heat and pressure are required to force the reaction to go, which conditions are unnecessary in Ritter.

73. Precision Instrument Mfg. Co. v. Automotive Maintenance Co., 324 U.S. 806, 65 S.Ct. 993, 89 L.Ed. 1381 (1945) ; Corning Glass Works v. Anchor Hocking Glass Corp., supra; compare Walker Process Equipment, Inc. v. Food Machinery & Chem. Corp., 382 U.S. 172, 86 S.Ct. 347, 15 L.Ed.2d 247 (1965). In rare instances, unclean hands may even apply to inadvertent or unintentional misrepresentations; see Abington Textile Machinery Works v. Carding Specialists, Ltd., 249 F.Supp. 823, 839–840 (D.C.D.C.1965).

ham's example 4 does not specify the use of a solvent. Defendant argues that Ritter's affidavit was deliberately misleading because it compared a Ritter example, which uses a solvent, with a Gresham example, which does not use a solvent. There is one crucial missing link in this argument; no evidence indicates that, merely because a solvent increases the yield of Ritter, a solvent would increase the yield of Gresham. The function of a solvent is to reduce the viscosity of solutions, such as the highly viscous mixture produced by Ritter's process (Tr. 685). Gresham's process includes large amounts of water. The resulting solution, being dilute, would not appear to require a solvent. In fact, none of the examples of Gresham specifies a solvent, nor is the use of one in any way suggested in the extensive teachings of his patent. Absent evidence that the use of a solvent in Gresham would have an effect on the yield, there is no reason to require Ritter to add one just to obtain an "exact" comparison. Moreover, we note that even when Ritter does not use a solvent, his yield is quadruple the highest of Gresham.[74]

■■ Ritter allowed his duplication of Gresham's example 4 to react for several hours, then boiled off the unreacted olefin and found that 96% of the original amount had not reacted. He concluded that, at best, there was a 4% yield. Defendant asserts that the yield should have been determined by measuring the "residue," i. e., the olefin which had combined with the other reactants to form an amide. There is one molecule of olefin in every molecule of the resulting amide. The amount of amide produced, therefore, can never be greater than 100% of the initial olefin. Thus, it makes no difference in determining yield whether it is calculated "directly" by measuring the residue, or "indirectly" by subtracting the amount of unreacted olefin from 100%. Indeed, the latter

method is more favorable to Gresham, since it assumes that all the "residue" is amide, not other by-products of side reactions. The court concludes that there are no false or misleading statements, intentional or otherwise, in Ritter's affidavit, and that it does prove that Ritter gives much higher yields that Gresham.

We turn to defendant's remaining allegations of "unclean hands." Defendant asserts that Ritter falsely stated that he had isolated the imino compound, or that it could be isolated. Ritter never stated, nor implied, that he had physically isolated the imino compound. He did teach that the compound "can be isolated if desired" (PX 1, col. 1, lines 14–15). In other words, he believed that this compound was a discrete, separable substance which could be physically isolated. There is not a shred of evidence to suggest that Ritter did not honestly believe this when he applied for his patent. Although we have concluded earlier that the imino cannot be isolated by the usual chemical tests, there is nothing to suggest that Ritter had any different belief than Dr. Mark, who plainly believed that it would have been easy in 1944 for Ritter to isolate the intermediate produced by his reaction (Tr. 281, 288). Most favorably construed, defendant's proof shows only that Ritter's belief that the compound could be "isolated if desired" has been disputed by some chemists.[75] Clearly, this involves a question of scientific debate, not inequitable conduct.

Finally, defendant asserts that Ritter, despite knowledge that example 2 of Gresham was anhydrous, stated that his process was different from Gresham's in requiring "substantially anhydrous conditions." The evidence previously cited shows that example 2 is not anhydrous because Gresham's alcohol formed water. Ritter, a competent chemist, and the Patent Examiner, presumably skilled in the art, would certainly have known that elementary fact. Accordingly, we

---

74. Compare Example 21 of Ritter patent, PX 1, col. 9, lines 25–40, with Gresham's Examples 1–6, DX I, Tab 7, col. 2, lines 23–55; col. 3, lines 1–54.

75. See DX P; compare with PX 18.

find that Ritter did not make any false representations or misleading statements, intentional or otherwise, in his affidavit, and there is no evidence of any inequitable conduct on his part. The defense of "unclean hands," therefore, has no merit.

Returning to the problem of obviousness, we must determine whether Ritter's practical improvement over Gresham is a patentable invention, or merely a mechanic's extension of the teachings of the prior art. Would the improved process have been obvious to the "specialized reasonable man," that "hypothetical mechanic who, among other things, has the prior art in his mind?" [76]

Any experiment can be modified in numerous ways. Gresham could be altered by splitting it up into various steps, by substituting possible equivalents, by omitting various reactants in a first step, by varying pressure and temperature, by adding new catalysts, etc. It cannot be said that it would be "obvious" to a man skilled in the art to try all these changes. Unless there is some specific reason for such effort, something in the prior art that indicates or suggests that such a change may be beneficial, it would be regarded as a colossal waste of time to try these endless theoretical variations.

It is true that Ritter's modification of Gresham is simple; he split the process into two steps by eliminating water and using concentrated sulfuric acid in the first step. Simplicity, however, cannot be equated with obviousness.[77] Defendant has presented no evidence that indicates that, as of 1944, a person skilled in organic chemistry would suspect that the yield of a "single-step" reaction would, in general, be greatly increased by splitting it up into a series of steps. Nor is there any evidence that even hints that it is an accepted procedure to eliminate water in the first step of reactions and then hydrolyze the intermediate. It is only by using the hindsight of Ritter's discovery that the two-step process becomes obvious.

Ritter teaches, contrary to the express teachings of Gresham, that the sulfuric acid is a reactant for producing amides. It was Ritter who saw that, instead of using Gresham's high temperature and pressure to force the reaction, superior results could be obtained by using concentrated sulfuric acid (Meyers, Tr. 562–67). The acid (the cation) reacts with the olefin to generate a carbonium ion, which attacks the nitrile, breaking the triple bond between the nitrogen and the carbon into the double bond of the imino compound. However, the carbonium ion is extremely sensitive to water; if water is present in large amounts, the carbonium ion will react with the water rather than with the nitrile, and no imino compound can be produced (Meyers, Tr. 631). The importance of restricting Gresham's water became obvious only after Ritter explained that the reaction works best through a carbonium ion mechanism (it is not clear what mechanism Gresham went through). The explanation will not be found in Gresham, Whitmore, or the rest of the prior art. Ritter did not simply describe correctly what someone else had previously done. He saw the general nature of the reaction between olefins, nitriles, and strong sulfuric acid, which no one else had seen. As we showed under the heading of Wieland and Dorrer, Ritter's general theory of this reaction was not obvious, despite all the prior art. Ritter's mechanism and generalized imino formula required an inventive insight on his part, a "conceptual advance." Ritter is entitled to patent the practical

76. Medina, J., in Formal Fashions, Inc. v. Braiman Bows, Inc., supra, 369 F.2d at 538. See Graham v. John Deere Co., supra; United States v. Adams, 383 U.S. 39, 86 S.Ct. 708, 15 L.Ed.2d 572 (1966).

77. Goodyear Tire & Rubber Co. v. Ray-O-Vac Co., 321 U.S. 275, 64 S.Ct. 593, 88 L.Ed. 721 (1944); Monroe Auto Equipment Co. v. Superior Industries, Inc., 332 F.2d 473, 477 (9 Cir.), cert. denied, 379 U.S. 901, 85 S.Ct. 190, 13 L.Ed.2d 175 (1964).

benefits that flow from this non-obvious conceptual advance.[78]

### (d) *The Mahan Patent*

The fourth prior art reference is the Mahan patent, "Production of Esters," United States Patent No. 2,408,940, filed June 24, 1944 and granted October 8, 1946.

Esters are a class of organic compounds distinct from amides, characterized by an oxygen molecule singly bonded to a carbon atom ($O=C-O$) rather than a nitrogen atom singly bonded to a carbon atom, as in the amide ($O=C-N$) (Meyers, Tr. 593). Mahan teaches the production of esters in a "single-stage operation" by reacting an olefin, a nitrile, and water in the presence of an acid catalyst.[79] He states that "the presence of water appears to be essential and is preferably added with the acid * * *."[80] The preferred sulfuric acid concentration is 65–70%. The acid is described as a catalyst and, like Gresham, Mahan does not suggest that it enters into the reaction in any way. He does not disclose any specific reaction mechanism and, indeed, admits that "the mechanism of the reaction is not clearly understood * * *."[81]

On its face, Mahan is different in many respects from Ritter. It is directed towards the production of different ultimate compounds, esters, not the ultimate amides taught by Ritter. Mahan is a single-step reaction to produce an ultimate ester; Ritter produces an imino intermediate and teaches a second hydrolysis step to form an amide. Mahan specifies water as a reactant, but Ritter requires "substantially anhydrous conditions." Despite all these differences, defendant asserts that Mahan antici-pates *if* the term "substantially anhydrous" is construed to cover sulfuric acid concentrations down to 70%, as Ritter contends.

Accepting plaintiff's reading of the term "substantially anhydrous conditions," both Ritter and Mahan claim a process reacting identical ingredients— an olefin, a nitrile, and 70% sulfuric acid. Under these conditions, it is inevitable that the same products will be formed in both processes (Meyers, Tr. 775–77, 781). Meyers admitted that using 70% sulfuric acid, the predominant end product of the Mahan process will be the "Ritter amide," with a much lesser yield of ester (Tr. 782–83). Defendant maintains that this proves that Mahan is "identical" with Ritter. It argues that it is immaterial that Mahan does not expressly teach the formation of amides; Ritter is not novel if he did nothing more than correctly label an end product of a process already known in the prior art.

It is true that the proper identification of a previously mislabeled product, produced by a known process, is not novel.[82] However, more than one process can occur in the same reaction mixture; simultaneously, different pathways are followed, different products formed. A previously unrecognized process, like Ritter, is not anticipated merely because a separate, known process, like Mahan, leading to a totally different result (an ester), happens to have the same reaction conditions and initial ingredients. Similarly, where products are "unwittingly produced, whilst the operators were in pursuit of other and different results, without exciting attention and without its even being known what was done or how it had been done, it would be absurd" to hold that this is anticipa-

---

78. See United States v. Adams, supra; Ling-Temco-Vought, Inc. v. Kollsman Instrument Corp., supra; Rich Products Corp. v. Mitchell Foods, Inc., 357 F.2d 176 (2 Cir.), cert. denied, 385 U.S. 821, 87 S.Ct. 46, 17 L.Ed.2d 58 (1966).

79. DX I, Tab 5, col. 1, lines 1–14; col. 2, lines 46–49; Mark, Tr. 438; File Wrapper, DX J.

80. DX I, Tab 5, col. 4, lines 22–23.

81. DX I, Tab 5, col. 2, lines 31–32.

82. In re Sussman, 141 F.2d 267, 269, 31 CCPA 921 (1944).

tion.[83] It is one thing to say that a rose by any other name is still a rose. It is far different to assert that the discovery of a rose means discovery of a bee which happens, incidentally, to be lost in its petals.

The evidence presented clearly establishes that Ritter did far more than correctly identify what Mahan had produced. Dr. Meyers' uncontradicted testimony established that, when 65–70% sulfuric acid, an olefin, and a nitrile are reacted, two different and distinct reaction systems are involved. One process, that taught by Mahan, leads to the formation of an ester. A separate process leads to the formation of the "Ritter amide." Both independent processes proceed simultaneously, when 65–70% sulfuric acid is used, because this is the point where Ritter's reaction mechanism starts to "fade out" and Mahan's starts to "fade in" (Tr. 779–790). Assuming, *arguendo*, that Ritter's patent does cover the use of 65–70% sulfuric acid, Mahan does not anticipate. Ritter discovered a new process, wholly unknown to Mahan, which happens to exist simultaneously with Mahan's under certain conditions. The existence of Ritter's process was an unrecognized by-product as far as Mahan is concerned and, therefore, Mahan does not anticipate Ritter.

There is nothing in Mahan, by itself or when considered with other prior art, that would render Ritter obvious. The production of esters does not necessarily suggest that amides are also formed (Tr. 592–93). The comparatively low yields of Mahan could be explained in many ways—undesirable side products, unreacted initial ingredients—without leading to the conclusion, or even the suspicion, that amides were being formed. In fact, defendant does not strongly argue that, to a man skilled in the art, Mahan would have added anything of significance concerning Ritter's discovery. Defendant's argument is simply

that, by blind chance, Mahan is "identical" with Ritter. We hold that it is not and, therefore, that it does not anticipate or invalidate Ritter.

### (e) *The Lichty Patent*

The final prior art reference is the Lichty patent of May 25, 1943, entitled "Acyl Acrylamide And Its Preparation," No. 2,320,089.

Example 1 of Lichty teaches an involved process reacting an alcohol and a nitrile to produce an amide.[84] Alcohol and water are added to concentrated sulfuric acid, and then two grams of bronze powder and a gram of hydroquinone are put into the reaction mixture. Next the nitrile is added, and the reaction mixture is heated for one and one-half hours. The mixture is cooled slightly, more alcohol and water added, and reheated. The reaction is allowed to proceed for 25 hours, then more water is added, the mixture is further treated, and the amide eventually obtained. The sulfuric acid involved is described as a catalyst; it is "usually necessary" when an alcohol is reacted.[85]

Defendant claims that Lichty anticipates because Ritter substituted a known equivalent, an olefin, for the alcohol in Lichty's example. As we noted earlier in our discussion of the "anhydrous" example 2 of Gresham, alcohol is equivalent to an olefin in the sense that they were both known, as of 1944, to generate a carbonium ion in strong sulfuric acid (Mark, Tr. 441). However, an alcohol in sulfuric acid also produces water. As we have previously noted, the Ritter patent teaches that "substances capable of producing water" under the reaction conditions should not be used. Therefore, like example 2 of Gresham, Lichty does not anticipate. It includes what Ritter excludes and thus does not "identically disclose" Ritter's process.

Lichty adds nothing to the previous prior art on the question of obviousness.

83. Tilgham v. Proctor, 102 U.S. 707, 711–712, 26 L.Ed. 279 (1880). See International Nickel Co. v. Ford Motor Co., 166 F.Supp. 551 (S.D.N.Y.1958).

84. DX I, Tab 3, col. 2, lines 1–35.

85. DX I, Tab 3, col. 1, lines 50–51.

Example 1 of Lichty teaches a complicated and limited reaction. The addition of the ingredients must be carefully controlled; a large excess of alcohol and water must twice be added. High temperatures and many hours are required to force the reaction to proceed properly. Bronze powder and hydroquinone must be added to prevent tarring, polymerization, and oxidation (Meyers, Tr. 683). Meyers' characterization of these reaction conditions as "extremely brutal" stands uncontradicted (Tr. 683). All Lichty indicated to a man skilled in organic chemistry, in 1944, is that it is possible to make amides, under very complicated conditions, by reacting olefins and nitriles. Such knowledge adds nothing to the teaching of Gresham. Indeed, if Ritter is not obvious from example 2 of Gresham, a fortiori it is not obvious from Lichty.

Accordingly, we find Ritter's patent, as to the claims in issue, valid, as we have construed it. We turn, then, to the defense of laches.

B. *Laches*

Defendant contends that the suit is barred by laches, asserting that Ritter had knowledge of its alleged infringement in 1956, did not commence suit until 1964, and that between 1956 and 1964 defendant expended large sums for plant expansion, new plant, research, advertising, and marketing in reliance upon plaintiff's acquiescence.

The mere lapse of time is not sufficient to constitute laches.[86] The delay must have been unreasonable and have resulted in prejudice to the defendant.[87] The crucial issue on the first element, unreasonable delay, is the question of knowledge; did plaintiff *knowingly* sleep on his rights?[88] If Ritter had sufficient knowledge of defendant's operations to be aware of the facts upon which this suit is based, the eight-year delay is obviously unreasonable. On the other hand, if he had no knowledge of such facts, there would be neither a reasonable basis for suit nor unreasonable delay. If plaintiff was adequately informed of the *facts*, ignorance of the law would not excuse delay.[89] Moreover, even if plaintiff had no actual knowledge, "a plaintiff may be barred when the defendant's conduct has been open and no adequate justification for ignorance is offered."[90]

Defendant relies on a series of letters between Ritter and Rohm & Haas to prove knowledge.[91] In 1956, Ritter wrote that he had learned of Rohm & Haas' "recent development in the field of tertiary carbinamines," and wondered if it was interested in acquiring rights under his patent. Defendant replied that its processes were different from, and superior to, Ritter's and that it, therefore, had no interest in his patent. Four years later, in 1960, Ritter wrote to the president of Rohm & Haas in detail about defendant's production of "tertiary alkyl primary amines." He stated that he believed that these products were being made by his patented process with "no more than minor alterations." He thought that defendant was adding small amounts of water to its reaction mixture, but since chemists

---

86. Reconstruction Finance Corp. v. Harrisons & Crosfield, Ltd., 204 F.2d 366, 37 A.L.R.2d 1117 (2 Cir.), cert. denied, 346 U.S. 854, 74 S.Ct. 69, 98 L.Ed. 368 (1953). Cf. Costello v. United States, 365 U.S. 265, 281–283, 81 S.Ct. 534, 5 L. Ed.2d 551 (1961).

87. Akers v. State Marine Lines, Inc., 344 F.2d 217 (5 Cir. 1965); United States v. Manufacturers Hanover Trust Co., 229 F.Supp. 544 (S.D.N.Y.1964).

88. Sobosle v. United States Steel Corp., 359 F.2d 7 (3 Cir. 1966); Amalgamated Dental Co. v. Lang Dental Mfg. Co., 200 F.Supp. 814 (N.D.Ill.1961). Cf. Holmberg v. Armbrecht, 327 U.S. 392, 66 S. Ct. 582, 90 L.Ed. 743 (1946).

89. Alexander v. Phillips Petroleum Co., 130 F.2d 593, 606 (10 Cir. 1942).

90. Chandon Champagne Corp. v. San Marino Wine Corp., 335 F.2d 531, 535 (2 Cir. 1964). See Mattison-Greenlee Service Corp. v. Culhane, 103 F.2d 608 (7 Cir. 1939).

91. DX L1–L5.

agreed that this water was not "water per se," its affect was negligible. He concluded by stating:

"I am directing these comments to you personally because I believe that you will evaluate them competently and objectively. Furthermore, as a now retired Professor of Chemistry at New York University I am obviously in no position to do anything more than present my case and hope for a just reaction."

The president of Rohm & Haas personally replied to this letter at some length. He stated that Rohm & Haas had not copied its processes from Ritter but had independently developed them. He set forth his interpretation of Ritter's patent claims, in light of the file wrapper history. He construed "substantially anhydrous conditions" to mean "not sufficient water to hydrolyze the addition product" and contrasted this limitation with defendant's processes, which, he said, used significant amounts of water as an initial reactant. He stated that "the optimum amount [of water] varies with the olefin and we use different ratios depending on the reaction we carry out * * * [in one case] the use of 30% sulfuric acid represents the most economical process. This is an extreme case, but claims considerably broader than the interpretation given [to Ritter's patent] would still not apply to the way we carry out the reaction." The letter concluded by inviting Ritter to write again "if there are things I have said above which need to be clarified or have further explanation."

Ritter did not answer this letter. In his deposition, he was asked if he had ever informed defendant that he believed what it told him. He responded: "No, but I gave consent by silence." Defendant takes Ritter's use of "consent" totally out of context and argues that it shows that Ritter approved of, or "apparently acquiesced in," defendant's operations. This is a blatant misreading of Ritter's statement; he was plainly referring to what defendant said it did, not what it actually did.

If Ritter did believe defendant's representations, he did not have sufficient knowledge to bring suit. The mere production of amines or amides clearly could not constitute infringement. Similarly, the use of an olefin, a nitrile, and sulfuric acid as initial reactants would not be significant if so much water were used that conditions could not possibly be called "substantially anhydrous." The crucial question, as Ritter recognized, was the amount of water defendant used in its processes. It was precisely this information Ritter sought to obtain from defendant.

Defendant's response to Ritter's inquiry was at best ambiguous; at worst, evasive and intentionally misleading. The statement that in one instance the use of 30% sulfuric acid was the "most economical" process was false. Dr. Bortnick admitted that, while a few laboratory experiments had been run using a 30% or 35% concentration of sulfuric acid, none of the commercial processes defendant developed ever used such a low concentration.[92]

Defendant's letter states that, even read broadly, Ritter's patent does not cover the Rohm & Haas processes. Even the strictest reading of Ritter's patent permits the use of 96% sulfuric acid; one of defendant's processes uses 90%. This slight difference may be significant on the question of infringement, but the sweeping tone of defendant's letter implies a far greater numerical difference. Rohm & Haas flatly presented Ritter with its conclusion that it was not infringing and did not give him any specific data upon which he could reasonably base a different conclusion. There was nowhere else he could turn for this vital information. Defendant's processes were, and still are, secret.

There is no evidence to suggest that after 1960 Ritter learned anything more about the amount of water in defendant's process, and he gives no explanation of

why he waited until 1964 to bring this action. Since the only way Ritter could have acquired the knowledge he needed was to pry it out of defendant on discovery, should he have recognized this in 1960 and have commenced suit at that time? In other words, did Ritter have "constructive" knowledge of the facts on which he now relies?

Unlike the usual case of constructive knowledge, the information Ritter needed was not open and publicly available. Ritter, at most, had a suspicion that defendant was infringing. To require Ritter to sue the moment this suspicion was aroused would be particularly inequitable in the present case. Ritter's suspicions were (at least temporarily) allayed by defendant's own representations. Perhaps Ritter was somewhat naive in failing to spot all the clever ambiguities and distortions of defendant's letter. However, there is no reason in law or logic that litigants must be detectives diligently following up the slightest clue that something is amiss. Defendant chose not to give Ritter the full story; it cannot now be heard to say that he should have realized how crafty it was. Surely a court of equity will not reward defendant's artful reply to straight questions by charging Ritter with constructive knowledge of all that defendant could have disclosed.

We find, therefore, that before 1964 Ritter did not have the knowledge, actual or constructive, required to institute suit and that there is no unreasonable delay. Thus, the suit is not barred by laches, and it is unnecessary to consider other issues raised on this defense.[93]

## C. *Infringement*

"The claims measure the invention." *Continental Paper Bag Co. v. Eastern Paper Bag Co.*, 210 U.S. 405, 410, 419, 28 S.Ct. 748, 52 L.Ed. 1122 (1908). The question of infringement depends "upon whether, when the claims are interpreted so as to cover what is patentably new in the * * * prior art, the accused method does substantially the same thing in substantially the same way." *Wabash Corp. v. Ross Electric Corp.*, 187 F.2d 577, 584 (2 Cir.), cert. denied, 342 U.S. 820, 72 S.Ct. 38, 96 L. Ed. 620 (1951). To simplify our discussion of infringement, we shall focus on Ritter's Claim 16:

"In a process for producing an N-mono hydrocarbon substituted imino compound, the step which comprises reacting one molecular proportion of hydrogen cyanide with one molecular proportion of sulfuric acid and one molecular proportion of a mono alkene having at least three carbon atoms, under substantially anhydrous conditions."

Defendant runs four processes which Ritter asserts infringe his patent.[94] It is undisputed that each of these four processes reacts hydrogen cyanide, sulfuric acid, and a mono alkene having at least three carbon atoms, in roughly molecular proportions.[95] The dispute

93. The parties have stipulated that between 1956 and 1964, defendant expended hundreds of thousands of dollars on plant expansion, marketing, advertising, etc. of products produced by the processes in suit. Thus, if there were unreasonable delay, there clearly was resulting prejudice. The earliest the letters indicate that plaintiff had the slightest suspicion that defendant was "infringing" was 1960, four years before suit. We have found no patent case where a four-year delay was regarded as "unreasonable."

94. See PX 23; Tr. 699–728; Defendant's Post Trial Brief, p. 9. Defendant also runs a fifth process, which produces menthane diamine (see DX R). Plaintiff originally asserted that this process infringed. He withdrew this assertion when he learned that this process uses 55% sulfuric acid. Defendant requests a declaratory judgment that this process also does not infringe. We grant this request.

95. See PX 23. Defendant uses slight excesses of sulfuric acid and hydrogen cyanide, 1.01 excess moles of sulfuric acid (i. e., a total of 2.01 moles) at the most (PX 23D). These excesses are within the Ritter patent, which teaches that "an excess over the stoichiometric quantity

arises because defendant uses at least one mole of water for every mole of alkene.

Plaintiff contends that defendant's processes react under substantially anhydrous conditions. He asserts that the water in these processes is not water as such, that it has no significant effect on the reaction, and that each process produces the claimed imino.

Defendant contends that "substantially anhydrous conditions" is fatally indefinite and, in any event, cannot include the use of a mole of water, in view of the teachings of the Ritter patent and the history of its prosecution. Defendant asserts that its water reacts with the other three components in molecular proportion and that each process produces an amide directly.

### (1) File Wrapper Estoppel

 The doctrine of file wrapper estoppel "is that a patentee who has limited or modified his claim in order to avoid rejection of his application for a patent may not thereafter claim for his patent a broader interpretation which would include elements eliminated or leave out elements added by the limitations or modifications."[96] Defendant's position (Defendant's Post Trial Brief, pp. 31–33) seems to involve two contentions.

First, defendant contends that Ritter *directly* limited the amount of water in his first step. In his initial application, Ritter said that he preferred "concentrated (96–100%) sulfuric acid" (DX H, p. 3), and that the first step should be performed "in the substantial absence of water" (DX H, pp. 5, 15–17). He retained this latter phrase in the text of his patent (PX 1, col. 3, lines 54–55), but in his claims he changed it to "under substantially anhydrous conditions." For some reason, this made the Patent Examiner happier.[97] The meaning was in no way changed. Clearly Ritter did not directly limit or modify the amount of water in his first step, either to avoid Gresham or for any reason. When Ritter did address himself to Gresham, he listed, naturally, Gresham's "aqueous medium" as one of several differences (DX G, p. 50). Gresham used 0–20% sulfuric acid, i. e., at least 26 moles of water per mole of $H_2SO_4$.[98] Accordingly, Ritter's comment, "aqueous," gives no clue as to what he would have called 77–90% sulfuric acid (the concentration defendant uses).

Second, defendant contends that Ritter *indirectly* limited the amount of water in his first step, because he limited himself to the first step and gave up the hydrolysis reaction producing an N-mono substituted amide, in order to avoid

---

may be used but is usually not desirable largely for economic reasons." PX 1, col. 2, lines 52–54. In other words, more than a mole of any reactant may be used, but the excess will not react.

96. Stiegele v. J. M. Moore Import-Export Co., supra, 312 F.2d at 592.

97. DX H, pp. 30–31, 36, 43–44. The Patent Examiner may have been misled by the misstatement at page 36 by plaintiff's former attorney: "Claims * * * have now been amended to replace the

term 'substantial absence of water' by the positive term 'under *anhydrous* conditions.' It is respectfully submitted that the claims, as thus amended, are now definite inasmuch as this term is not a negative limitation and is widely accepted in the patent art as defining a state or condition." (Emphasis added.) However, "substantially" is implied in every patent, and the use of the word will not effectively broaden the patent. Musher Foundation, Inc. v. Alba Trading Co.; 150 F. 2d 885, 889 (2 Cir. 1945).

98. A mole of $H_2SO_4$ weighs 98 grams.

$$\frac{98}{98 + X} = .20 \qquad X = 480 \text{ grams of water.}$$

Divide 480 by the molecular weight of water, 18. Result: 26.6 moles of water per mole of $H_2SO_4$ in 20% sulfuric acid.

Gresham. This is clearly true (DX G, p. 51). Its import will be considered under the heading "The Doctrine of Equivalents."

(2) *The Meaning of "Under Substantially Anhydrous Conditions"*

"Anhydrous" is a chemical term of art meaning "without water" (Mark, Tr. 413; Meyers, Tr. 735–36). "Substantially anhydrous" is not a chemical term of art. Defendant contends that it is fatally indefinite.[99]

The phrase is given some meaning by two sentences in Ritter's patent. In PX 1, col. 3, lines 53–58, Ritter teaches: "I have found in general that the primary reaction should be carried out in the substantial absence of water or substances capable of producing water under the reaction conditions, i. e. under anhydrous or substantially anhydrous conditions." Ritter is talking about *conditions*. The patent never talks of substantially anhydrous sulfuric acid, because the acid is only one place where excess water might intrude. As to the sulfuric acid, the patent clearly teaches this much: "The preferred cationoid substances are those containing an $-HSO_3$ group, particularly concentrated (96–100%) sulfuric acid." (PX 1, col. 2, lines 36–39; Mark, Tr. 401–02, 411–12; Bortnick, Tr. 913.)

Sulfuric acid of 99.9–100% concentration is called anhydrous sulfuric acid (Tr. 736, 925). It is not common, because strong sulfuric acid rapidly picks up water from the air (Tr. 602–04). Below 100%, percentages are misleading, because they represent scale weights. Chemists are much more concerned with moles, which represent molecular weights. Sulfuric acid of 96% concentration contains only 4% of water by scale weight, but it contains .23 mole of water per mole of $H_2SO_4$.[100]

Therefore, when Ritter says "under substantially anhydrous conditions," it is clear that he means at least up to .23 mole of water per mole of $H_2SO_4$ (also per mole of nitrile and per mole of olefin, since Ritter teaches molecular proportions of the three components). (PX 1, col. 2, lines 36–39; Mark, Tr. 401–02, 411–12; Bortnick, Tr. 913.)

Plaintiff was entitled to prove that the patent teaches a broader meaning of "under substantially anhydrous conditions." He attempted to do so, but the court has concluded, as will be seen, that the patent teaches nothing about using more than .23 mole of water per mole of $H_2SO_4$. Within its teaching, "96–100%," the patent is precise and easy to follow. It is not fatally indefinite.[101]

---

99. Interestingly, the phrase "under substantially anhydrous conditions" was used in In re Bremner, 182 F.2d 216, 37 CCPA 1032 (1950), and apparently no one objected. However, that patent involved "a Friedel-Crafts type catalyst." It seems likely that the water limit in that patent would be reached when the particular Friedel-Crafts type catalyst chosen decomposed (Tr. 455–56; presumably some Friedel-Crafts type catalysts are more resistant to water than $AlCl_3$ is). If so, the phrase, in that context, had a quite definite meaning to a skilled chemist.

100. A mole of $H_2SO_4$ weighs 98 grams.

$$\frac{98}{98 + X} = .96 \qquad X = 4.16 \text{ grams of water.}$$

Divide 4.16 by the molecular weight of water, 18. Result: .23 moles of water per mole of $H_2SO_4$ in 96% sulfuric acid.

---

101. May 12, 1967 Tr. 25–26; Georgia-Pacific Corp. v. United States Plywood Corp., 258 F.2d 124, 136–37 (2 Cir.), cert. denied, 358 U.S. 884, 79 S.Ct. 124, 3 L.Ed.2d 112 (1958).

Plaintiff maintains that the infringement issue turns on the peculiar chemistry of sulfuric acid and water. This chemistry is particularly relevant because defendant adds its water to the sulfuric acid before that mixture is introduced to the nitrile and the olefin. (See PX 23.)

Defendant's four processes use 77%, 80%, 87%, and 90% sulfuric acid (PX 23; Defendant's Post Trial Brief, p. 9).

Meyers testified that when one mole or less of water is added to one mole of sulfuric acid, a violent reaction occurs (Tr. 589):

$$H_2O + H_2SO_4 \longrightarrow H_3O^+ \quad + \quad HSO_4^- \quad \text{(see PX 24)}$$

When one mole of water is added to one mole of sulfuric acid, the result is 84.3% sulfuric acid, which is also called sulfuric acid monohydrate (Tr. 595–96, 220).

Below 84.3%, if a second mole or less of water is added, Meyers testified that "the water is tied up in a similar manner" (Tr. 596). He did not give the equation for this reaction. Plaintiff's counsel, at page 6 of plaintiff's reply brief,[102] gave it as:

$$HSO_4^- + H_2O \longrightarrow SO_4^= + H_3O^+$$

When two moles of water are added to one mole of sulfuric acid, the result is 73.4% sulfuric acid, which is also called sulfuric acid dihydrate (Tr. 596, 196).

Below 73.4%, if still more water is added, that water remains $H_2O$ and does not change to $H_3O^+$. Meyers testified that "it is known in the chemistry of sulfuric acid that when one goes from 100 per cent sulfuric acid down to zero there is a break in the amount [the species $H_2O$] somewhere around 70 per cent sulfuric acid." (Tr. 592–93.)

Defendant did not dispute this testimony, which so far concerned only the chemistry of sulfuric acid and water together by themselves. Before one can know the meaning of "under substantially anhydrous conditions" in the Ritter patent, one must know whether the chemistry is different when other reactants are added. Hence Ritter and Meyers

conceded that "under substantially anhydrous conditions" by itself has no meaning, that the meaning "depends on the reactants" (Tr. 826, 662).

Meyers testified that hydronium ions ($H_3O^+$) are not water as such, that they are bound to the bisulfate ($HSO_4^-$) or sulfate ($SO_4^=$) ions and are no longer free to react (Tr. 589, 595, 808). This is not always true. The water in even 99.-9% sulfuric acid will react with some substances, for example the reactants used in the Karl Fischer test (Tr. 925–28). Meyers apparently conceded this, but stated that in Ritter's process "the reacting species does not want the water more than the sulfuric acid" (Tr. 754). He did not say what concentration of acid he was talking about. Moreover, he conceded that under Ritter's patent a chemist would have to make pilot experiments to determine the permissible range of water with any particular nitrile and olefin (Tr. 726–28). Such experiments were made by Ritter and Meyers, who are skilled chemists; yet as late as 1965 they could not get the process to work at 90% and could not understand how Rohm & Haas could (DX C and D). Obviously, when Ritter claimed "under substantially anhydrous conditions," he did not mean "above around 70% sulfuric acid," and a skilled chemist would not have read that meaning. To a skilled chemist, the most the patent teaches about "substantially anhydrous

---

102. Plaintiff's counsel writes "$OSO_3H^-$"

in place of "$HSO_4^-$" but for clarity we have written the latter because Meyers wrote the latter on PX 24.

conditions" is "up to .23 mole of water per mole of $H_2SO_4$."

### (3) The Doctrine of Equivalents

Plaintiff's main argument, however, is somewhat different. Plaintiff says that the phrase should be given an "operational" or "functional" definition (Tr. 725–26, 751). This argument belongs under the rubric of equivalents.[103]

By a "functional definition" plaintiff means: "conditions are no longer substantially anhydrous * * * when the chemist finds the desired reaction (production of imino compounds) does not take place." (Plaintiff's Post Trial Brief, p. 14.) By "production of imino compounds," plaintiff means that "the imino sulfate has some stability" (Tr. 637, 825) and that the reaction can be stopped at the point when the imino is produced (January 27, 1967 Tr. 29).

Meyers testified that in Ritter's patented process, as in other water sensitive processes, 70% or 80% sulfuric acid achieves the same result as the 96% sulfuric acid taught by Ritter (Tr. 591–92). Moreover, plaintiff contends that the 70% breaking point between $H_3O^+$ and $H_2O$ has a direct correlation with the results of the Ritter reaction: that above 70% virtually all of the product is Ritter's imino (Tr. 195–97), whereas below 70% the imino fades out (Tr. 597–98), the product is predominantly N-mono substituted amide, and significant amounts of ester appear (Tr. 592, 779–782).

Ritter never taught this. In fact, in early 1965 Ritter and Meyers tried to run their process with 90% sulfuric acid. They were trying to show that acid at

defendant's concentrations still produces Ritter's imino. Yet when they used 90% acid, 75% of their olefin did not even react (DX C). They could not understand how defendant got the reaction to work with 90% acid (DX C; DX D). Subsequently, they got it to "work" with as low as 80% acid (Tr. 821; see Tr. 211, 221, 262), although, as we shall see, these reactions produced a protonated amide, not Ritter's imino. Strangely, they never explained to the court what changes they had to make to correct their initial failures. At their depositions, Ritter and Meyers made various guesses as to the *lowest* workable concentration of acid, but admitted that below 80% they were simply guessing (Ritter, Tr. 658–59 (60%); Meyers, Tr. 821 (65–70%)). However, Ritter's earlier lack of knowledge does not preclude him from invoking the doctrine of equivalents now.

Plaintiff asserts that defendant's water is inert (Tr. 808), just as if it were added to the reaction encased in unbreakable capsules. Therefore, plaintiff contends, all of defendant's processes are equivalents of Ritter's patented 96–100% process. However, we find that defendant's water is not inert.

We agree that at the start of the reaction the water is bound to the sulfuric acid. However, in the reaction the sulfuric acid is immediately used up. The bisulfate ion attaches to the carbon atom which used to be part of the nitrile and is now doubly bonded to the nitrogen. The hydrogen ion attaches to the olefin and forms the carbonium ion.[104] With molecular proportions, once the imino is formed there is no sulfuric acid left to bind the water.[105] At this point, what

---

103. See Georgia-Pacific Corp. v. United States Plywood Corp., supra, 258 F.2d at 136–37.

104. Plaintiff's position is contradictory as to where this hydrogen ion comes from when water has been added to the sulfuric acid. Meyers said that it "comes directly from the sulfuric acid and not from the * * * $H_3O+$" (Tr. 600). Plaintiff's Reply Brief, pp. 2–3, said that it comes from the hydronium ion.

105. In one of defendant's processes (see PX 23D), Meyers' theory suggests that the water would still be bound, because that process uses 1.20 moles of water and an *excess* of 1.01 moles of sulfuric acid. However, Ritter testified that 84% sulfuric acid will quench the imino (Tr. 220–21). Meyers did not give a clear answer on this point (Tr. 755, 822).

happens to the water? Does it tag along after the bisulfate ion? Does it react with some other atom or atoms? Or does it keep aloof from the reaction?

Bortnick testified that each of defendant's four processes could be represented by a sequential mechanism, which he drew at defendant's exhibits AA and AB.[106] In substance, he testified as follows: defendant's water remains inert until the nitrilium salt is formed. [As we have shown above, the nitrilium salt is the resonance hybrid of Ritter's imino.] However, the nitrilium salt is immedi-

ately attacked by the water and converted to

$$(CH_3)_3 \; C-N=C-H, \quad \overset{+}{O}H_2, \quad HSO_4^-$$

which immediately changes into defendant's first stable compound, a protonated amide, which is represented by the following equilibrium system:

$$(CH_3)_3 \; C-N=C-H \; \overset{+}{O}H_2 \; HSO_4^- \; \rightleftharpoons \; \left[ (CH_3)_3 \; C-\overset{H}{\underset{}{N}}-C-H \; OH \right]^+ HSO_4^- \; \rightleftharpoons \; (CH_3)_3 \; C-\overset{H}{\underset{H}{\overset{\oplus}{N}}}-\overset{O}{\overset{\parallel}{C}}-H$$

—◆—

These three structures cannot be separated from each other. They exist simultaneously, with the middle structure comprising more than 99% of the compound (Tr. 956–966, 1006–07, 1028).

We accept Bortnick's description of a protonated amide. Plaintiff took no issue with it except for plaintiff's counsel's implication that "Katritzky," an article not in evidence, states that the predominant structure is the left hand structure (Tr. 1001–02). In any event, the crucial point is that each of the three structures contains two more hydrogen atoms and one more oxygen atom than Ritter's imino.

Meyers testified that each of defendant's four processes produces an N-mono hydrocarbon substituted imino bisulfate, which contains no extra hydrogen or oxygen atoms and which is stable and separ-

able ("sitting in a generator. It is isolated." Tr. 812.). He drew their formulas at defendant's Exhibit T.

We reject this testimony. Plaintiff claims that he duplicated one of defendant's processes in January 1966. In response to Judge Ryan's order dated February 28, 1966, plaintiff submitted an affidavit, defendant's Exhibit Y, purporting to show that the product of this duplication was an N-mono hydrocarbon substituted imino compound. Plaintiff reacted the following compounds in molecular proportions: dodecene-1 ($C_{12}H_{24}$), acetonitrile ($CH_3CN$), and 88% sulfuric acid ($H_2SO_4$). If the water in the acid did not react and Ritter's imino was formed, the product would have contained the following atoms: $C_{14}H_{29}NO_4S$ (DX X). In fact, plaintiff obtained the molecular weight of the product and deter-

106. Bortnick also speculated a concerted mechanism, which we reject. He did not name any other comparable process which proceeds by a concerted mechanism (Tr.

993). Moreover, before this litigation his speculations were confined to sequential mechanisms (PX 28; Tr. 1013–18).

mined that it contained the following atoms: $C_{14}H_{31}NO_5S$ (DX Y, at p. 3). In other words, the product had two more hydrogen atoms and one more oxygen an atom of oxygen and two atoms of hydrogen in the imino compound isolated atom than Ritter's imino. Plaintiff's affidavit did not explain why the product had these extra atoms. Plaintiff's reply brief, at page 4, asserts: "Defendant distorts this clear affidavit by the ridiculous statement that because there is and identified, water had reacted * * *. Certainly the two hydrogen atoms and the oxygen atom came from somewhere. The evidence suggests only one explanation: the water in the acid solution reacted and the product was a protonated amide. In fact, it seems likely that with 96% sulfuric acid, which contains .23 mole of water per mole of $H_2SO_4$, Ritter's product is actually 77% imino and 23% protonated amide.

We find that the water in each of defendant's four processes reacts with the other three components in molecular proportion, that defendant's first stable product is a protonated amide,[107] and that the Ritter imino (or nitrilium salt) occurs only as a transient. As noted before, plaintiff has conceded that a transient imino does not infringe his patent (January 27, 1967 Tr. 29; Tr. 637, 825).

Plaintiff blandly asserts that, anyway, a protonated amide *is* an imino compound (Tr. 834; Plaintiff's Reply Brief, p. 5). Put in its best light, this amounts to one more invocation of the doctrine of equivalents. The prior art and the history of this patent preclude a holding that the protonated amide is equivalent to Ritter's imino.

In one important respect, the protonated amide functions the same as the imino—when dumped into a large amount of water it turns into an N-mono substituted amide. Actually the protonated amide is exactly half way between Ritter's imino and an N-mono substituted amide. Like the latter, it has taken on two hydrogen atoms and one oxygen atom, but like the former, it still contains the bisulfate ion. In other words, a protonated amide is a Ritter imino which has been quenched but not neutralized.

Gresham produced an N-mono substituted amide in one step. Ritter discovered a two-step process: (1) formation of the imino and (2) hydrolysis (which quenches and neutralizes (Tr. 415–17)). Rohm & Haas discovered a different two-step process: (1) formation of the imino (or nitrilium salt) and immediate quenching and (2) neutralization.

Ritter's patent teaches that a large excess of water is needed to neutralize, but only one mole of water is needed to quench (PX 1, col. 4, lines 38–50; Tr. 421–23, 511). Yet Ritter never thought of separating the quenching and the neutralizing (Tr. 665). Rohm & Haas does not claim that its discovery is inventive (PX 27). It does claim that its process gives products of better quality (Tr. 921–22), but these products are "the products which we sell," i. e., the *amines* which defendant produces from the N-mono substituted amides.

When Ritter first applied to the Patent Office, he tried to patent both steps of his process. He gave the formula for his imino intermediate (DX H, p. 4), but in his claims he called it merely "the reaction product" (DX H, pp. 15–17). To avoid Gresham, he limited himself to the first step. Naturally, he was forced to claim the product more specifically. Moreover, he gave up the entire second step, both the quenching and the neutralizing. He cannot now extend his claim

---

107. In arriving at this conclusion, we have given no weight to Meyers' and Bortnick's testimony about what can be demonstrated by a nuclear magnetic resonator and by infrared and ultraviolet spectra (Tr. 823, 828, 931–935). Their contentions were exactly contrary to the predictions of both counsel at pretrial conference (January 27, 1967, Tr. 28). Moreover, photostats of the spectra were never introduced.

to cover another reaction product and certainly not one which has been quenched.

Accordingly, we find that defendant does not infringe any of the claims of plaintiff's patent.

### Attorney's Fees

■■ Defendant seeks an award of attorney's fees under 35 U.S.C. § 285, which empowers the court to grant reasonable attorney's fees to the prevailing party in "exceptional cases." Such an award must generally be made upon a finding of bad faith on the part of the losing party.[108] There is no bad faith here, nor are there any other circumstances justifying such an award. Accordingly, the application for attorney's fees is dismissed.

### Conclusions

■ 1. The Ritter patent, No. 2,-573,673, is valid.

2. Defendant's processes for making t-butylamine, t-octylamine, Primene 81-R, Primene JM-T, and menthane diamine (as respectively represented by PX 23A, 23B, 23C, 23D, and DX R) do not infringe the Ritter patent.

The foregoing opinion, footnotes, and glossary constitute the court's findings of fact and conclusions of law, as required by Fed.R.Civ.P. 52(a). We reject the proposed findings of fact submitted by both parties, except to the extent they are embodied in this opinion.

Judgment will be entered: (1) declaring the Ritter patent valid and non-infringed; (2) dismissing plaintiff's demand for an injunction, an accounting, and damages; (3) granting defendant's prayer for a declaratory judgment to the extent that it is adjudged not to infringe plaintiff's patent and denying relief to the extent that defendant seeks to declare the Ritter patent invalid or unenforceable; and (4) denying defendant's application for attorney's fees.

Submit judgment on notice within ten (10) days from the filing of this opinion.

---

108. Formal Fashions, Inc. v. Braiman Bows, Inc., supra, 254 F.Supp. at 395; Delamere Co. v. Taylor-Bell Co., 249 F. Supp. 471, 479–480 (S.D.N.Y.1966).

## APPENDIX

$$CH_3 \quad OSO_3H$$
$$R-C-N-C-CH_3 \;\; \underline{IV} \quad \rightarrow$$
$$CH_3$$

$$CH_3 \quad OSO_3H$$
$$C-C-N=C-CH_3 \quad \text{(I)}$$
$$CH_3$$

$$C-N-C-R$$
$$OSO_3H \quad CH_3$$

$$CH_3$$
$$R-C-N\equiv C-CH_3 \quad [H_2SO_4]^- \;\; \underline{II}$$
$$CH_3 \qquad {}^{+}\,[OSO_3H]$$

$$CH_3 \quad OSO_3H$$
$$R-C-N-C-CH_3 \quad \underline{V}$$
$$CH_3 \quad \quad C-R$$
$$HO_3SO-C \quad N-C-CH_3$$
$$CH_3 \quad OSO_3H$$
$$CH_3-C-CH_3$$
$$R$$

$$CH_3 \quad O$$
$$R-C——N-C-CH_3 \quad \underline{III}$$
$$CH_3 \quad SO_3H$$

PLAINTIFF'S EXHIBIT 16

### GLOSSARY

As used in the court's opinion, the following terms are defined on the basis of the evidence presented and/or standard dictionaries:

Alkene:
A straight or branched chain hydrocarbon characterized by the presence of two carbon atoms with a double bond between them (C=C). Alkenes have a deficiency of hydrogen in their structures and are therefore said to be unsaturated. Alkenes are a member of the olefin series.

Amide:
An organic compound characterized by a carbon atom doubly bonded to an oxygen atom and singly bonded to a nitrogen atom (N—C=O).

Amine:
An organic compound structurally similar to amonia (NH₃); in an amine, one hydrogen atom of the amonia molecule has been replaced by one or more hydrocarbon radicals.

Carbonium Ion: An organic ion carrying a positive charge at a carbon location owing to an electron deficiency, i. e., the presence of an extra proton.

Cationoid: A proton donator (usually an acid).

Ethylene: An unsaturated hydrocarbon compound having at least one double bond between two carbon atoms ($C=C$).

Hydrolyze: To react with water. In the Ritter process, hydrolysis normally performs two separate functions. First, it adds a molecule of water to each molecule of intermediate ("quench"); second, it removes the bisulfate ion from the intermediate ("neutralize").

Imino: An organic compound characterized by a nitrogen atom doubly bonded to a carbon atom ($N=C$).

Intermediate: A discrete, stable chemical compound which is transformed during the course of a process into a different end product.

Nitrile: An organic compound characterized by a triple bond between a carbon atom and a nitrogen atom ($C\equiv N$); a cyanide.

N-Mono Hydrocarbon Substituted Imino: The particular class of compounds the Ritter patent claims to produce; a subgenus of the imino group, having a single ("Mono") radical ("Hydrocarbon") in place of ("Substituted") a hydrogen atom on the nitrogen atom ("N").

Neutralize: To remove an acid ion from a compound, producing a stable, uncharged product. In Ritter, the removal of the bisulfate ion, by either an excess of water or other neutralizing agents (sodium acetate).

Olefin: An unsaturated hydrocarbon containing at least one double bond ($C=C$).

Quench: To add a molecule of water to a compound.

Radical (R): A group of atoms replaceable by a single atom, or remaining unchanged during a series of reactions and hence conveniently regarded as playing the part of a single atom; in Ritter, often a hydrocarbon chain.

Transient: A compound that may be momentarily formed during the course of a chemical reaction, but whose existence (if any) is so brief and structure so inherently unstable that there is no possible method, even theoretically, of proving the formation of the compound. The existence of such a compound can never be experimentally verified, unlike the existence of a genuine intermediate.

Unsaturated: Any compound containing one or more double bonds, due to a deficiency of hydrogen.